# Illinois Official Reports

## Appellate Court

*Jones v. Beck*, 2014 IL App (1st) 131124

| | |
|---|---|
| Appellate Court Caption | MELVIN JONES and LOLEATHER JONES, Plaintiffs-Appellants, v. CHARLES BECK, M.D., Defendant-Appellee. |
| District & No. | First District, Fourth Division<br>Docket No. 1-13-1124 |
| Filed | July 24, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a medical malpractice action for the injuries suffered by plaintiff due to the postoperative perforation of his colon as a complication of spinal surgery, the verdict for defendant physician was upheld over plaintiffs' contentions that the trial court erred in allowing defendant and his expert to testify about the efficacy of intervening with a nasogastric tube to alleviate plaintiff's colonic distention, dismissing a juror for her religious beliefs, and instructing the jury on sole proximate cause, since the opinions of defendant and his expert about the use of the nasogastric tube were all logical corollaries of the pretrial disclosures made by the defense and there was no showing that plaintiffs were prejudiced by the testimony, the juror was dismissed for disobeying the court's order not to communicate with plaintiffs, not because of her religious beliefs, and although the trial court erred in giving the instruction on sole proximate cause, the error was harmless in the absence of any prejudice, especially when the general verdict that defendant was not negligent indicated that the issue of causation was not reached. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-L-2563; the Hon. Allen S. Goldberg, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on          Joseph J. Miroballi and Lauren A. Levin, both of Miroballi, Durkin &
Appeal              Rudin, LLC, of Chicago, for appellants.

                    Sherri M. Arrigo, Karen Kies DeGrand, and Victoria Hartstein, all of
                    Donohue, Brown, Mathewson & Smyth, of Chicago, for appellee.

Panel               JUSTICE LAVIN delivered the judgment of the court, with opinion.
                    Presiding Justice Howse and Justice Epstein concurred in the
                    judgment and opinion.

## OPINION

¶ 1    Plaintiffs Melvin Jones (Melvin) and Loleather Jones (Loleather) appeal from the entry of judgment on a jury verdict in favor of defendant Dr. Charles Beck, M.D. This action for medical malpractice stems from a colonic perforation which occurred postoperatively as a complication from spinal surgery. On appeal, plaintiffs assert that the trial court erred in: (1) allowing Beck and his defense expert to testify regarding the indication for and the efficacy of medical intervention with a nasogastric (NG) tube to alleviate plaintiff's colonic distention; (2) dismissing one of the jurors for her religious beliefs; and (3) instructing the jury on sole proximate cause, as contained in the long form of Illinois Pattern Jury Instructions, Civil, No. 12.04 (2012) (hereinafter, IPI Civil (2012) No. 12.04), regarding sole proximate cause. For the following reasons, we affirm.

¶ 2                            BACKGROUND
¶ 3    On February 6, 2008, Melvin underwent a successful cervical laminectomy at Ingalls Memorial Hospital performed by neurosurgeon Dr. Martin Luken. Postoperatively, Beck, an internist, evaluated Melvin for pulmonary and blood pressure concerns at Luken's request. Melvin developed gastrointestinal issues and Beck ordered a KUB (kidney, ureter, bladder) X-ray to assist in the evaluation of Melvin's abdominal distress. Beck remained involved in the patient's care for a number of days during which, among other things, he monitored Melvin's constipation and resulting colonic distention, which sometimes occurs in varying degrees as a complication following surgery under general anesthesia. Just before he was scheduled to leave for vacation, Beck asked an associate to take over his aspect of the patient's care and also requested a consult by Dr. Shibban Ganju, a gastroenterologist, to evaluate the possibility of a colonic obstruction which could constitute a medical emergency. Ganju evaluated Melvin and ordered more testing. Shortly thereafter, Melvin suffered a catastrophic perforation of his colon, which was subsequently removed and replaced by a permanent ileostomy tube.

¶ 4    On December 4, 2008, Melvin filed a complaint against Beck, Ganju and Ingalls, alleging medical negligence. Specifically, Melvin alleged that defendants failed to properly diagnose and treat Melvin's acute colonic disturbance, medically recognized as a pseudo-obstruction

known as Ogilvie syndrome, which ultimately resulted in the perforation of his colon. A year later, Melvin amended his complaint to name Loleather as a party and include a loss of consortium claim. Pertinent to one of the issues raised on appeal, plaintiffs settled with Ganju and Ingalls and ultimately tried their case solely against Beck.

¶ 5    On appeal, plaintiffs supplied this court with the testimony of but three witnesses that testified in their case-in-chief. The testimony of Melvin, whose medical condition spurred the lawsuit, is not included. It would thus appear that certain parts of the trial transcript appear to be missing. Beck, however, makes no objection, and the record appears to be sufficient to consider each of the errors raised on appeal. See *In re Marriage of Epting*, 2012 IL App (1st) 113727, ¶¶ 35-37.

¶ 6    On adverse examination, Beck testified that he evaluated Melvin in the recovery room for pulmonary and blood pressure issues, while also prescribing magnesium sulfate as "routine simple treatment for constipation," which was said to be a known complication from surgery under general anesthesia. As part of his management, several days into the postoperative period, Beck ordered a radiological study of his abdomen that revealed a distended colon, but without evidence of obstruction, which would have required immediate intervention. The following day, Beck requested a gastroenterology (GI) consultation with Ganju, who took over Melvin's GI care. Beck then left town on a scheduled leave after handing off his care to an associate. Upon his return, Beck learned of the unfortunate and traumatic event that occurred in his absence.

¶ 7    Plaintiffs' expert, Daryl Fortson, M.D., a board-certified family physician, testified that Beck deviated from the standard of care by failing to adequately perform a history and physical examination of Melvin. It was Fortson's opinion that Beck was the "attending physician," based both on the factual circumstances and certain entries in the medical record. The attorneys of record sparred back-and-forth on this issue, with plaintiffs endeavoring to prove that Beck was in charge of the patient's hospitalization and defendant seeking to persuade the jury that he was called in to consult on the internal medicine issues at Luken's request. In Fortson's opinion, even though Beck did ask an associate to cover for him while he was out of town, the mere ordering of a specialist consultation for the brewing GI issues did not relieve Beck of responsibility for Melvin's care. As for the specific failure to medically intervene to relieve Melvin's colonic disturbance, Fortson testified that Beck was negligent for failing to insert an NG tube and that this relatively simple procedure would have alleviated the colonic distention and prevented the later perforation.

¶ 8    Loleather testified that she believed Beck was the physician in charge of Melvin's primary care and she continuously informed Beck about Melvin's GI problems. In addition, she testified to the severity of Melvin's illness and pain after his colon removal, as well as his long-term care and daily struggles with the ileostomy.

¶ 9    Following this testimony, a sidebar conference was held at Beck's request based on certain observations made of a juror who was allegedly communicating, seemingly in a supportive way, with plaintiffs. We will more fully explicate these proceedings later in our analysis on this issue.

¶ 10    Beck presented his defense, first calling Ganju, who testified that he was called in by Beck to evaluate Melvin for a possible colonic obstruction. Ganju evaluated Melvin's chart and then performed a history and physical. Ganju requested that narcotics be withheld to alleviate constipation, ordered another X-ray of the abdomen and was contemplating the performance of

a colonoscopy as soon as the patient's colon could be sufficiently emptied to obtain a diagnostic result. Ganju testified that, as of the time of his initial visit with the patient, he saw no indication that Melvin would imminently perforate, an event that unfortunately occurred some hours later.

¶ 11     William Soden, M.D., a triple-board-certified physician (internal medicine, anesthesiology and critical care medicine) retained by Beck, testified that during Melvin's postoperative period, the principal medical concern related to respiratory health and blood pressure, but that GI issues did become a focus over a period of time. Soden believed that Beck acted at all times within the standard of care and particularly when he deferred Melvin's GI care and treatment to Ganju, a specialist in that area. When asked if the standard of care required Beck to "put in an NG tube," plaintiffs' counsel objected and a sidebar commenced.

¶ 12     At the sidebar, the trial court reviewed Beck's expert witness interrogatory answers and determined that testimony regarding the NG tube was properly disclosed and testimony would be allowed. In addition, the court permitted Soden and Beck to offer opinion testimony in contradiction of Fortson's testimony, since the disclosures revealed that each "disagreed" with Fortson's specific opinion in this regard. See Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2007). The trial court also allowed Beck to demonstrate the mechanical use of an NG tube with the caveat that any discussion should be consistent with Fortson's testimony on the matter. Soden then testified that the standard of care did not require Beck to place an NG tube in Melvin and that any such insertion would not have prevented his colon perforation.

¶ 13     Beck testified in his own defense about being called in by Luken for an internal medicine consultation for Melvin's postoperative care. This ultimately led him to begin evaluating the patient's constipation. At some point during this care, Beck was concerned that a colonoscopy (only performed by GI physicians) would need to be performed for diagnostic purposes, so he decided to call in Dr. Ganju. Beck testified that he disagreed with the opinion that insertion of an NG tube was medically indicated while he was caring for the patient. He then demonstrated the placement of an NG tube using a real tube and a diagram of the intestinal tract. The plaintiffs renewed their objection and the trial court again instructed defense counsel not to go beyond the disclosed opinion regarding the standard of care during the demonstration. Beck also testified that none of his actions or inactions caused or contributed to injury to the plaintiffs.

¶ 14     On November 14, 2012, the jury reached a verdict in favor of Beck, and the trial court entered a judgment on the verdict. The trial court denied plaintiffs' posttrial motion and this timely appeal followed.

¶ 15                                              ANALYSIS

¶ 16     Plaintiffs first contend that the trial court erred by allowing Beck and his expert to testify that insertion of an NG tube was not medically indicated while Beck was treating him, claiming that Beck's written disclosures during pretrial proceedings were generic and the testimony thus violated Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2007). The purpose of discovery rules, governing the timely disclosure of expert witnesses, "is to avoid surprise and to discourage strategic gamesmanship" amongst the parties. (Internal quotation marks omitted.) *Steele v. Provena Hospitals*, 2013 IL App (3d) 110374, ¶ 92. As a result, Rule 213(f)(3) states as follows:

"A 'controlled expert witness' is a person giving expert testimony who is the party, the party's current employee, or the party's retained expert. For each controlled expert witness, the party must identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2007).

Pursuant to the rule, a witness may elaborate on a disclosed opinion as long as the testimony states *logical corollaries* to the opinion rather than new reasons for it. *Spaetzel v. Dillon*, 393 Ill. App. 3d 806, 812 (2009). The decision of whether to admit or exclude evidence, including whether to allow an expert to present certain opinions, rests solely within the discretion of the trial court and will not be disturbed absent a demonstrated abuse of discretion. *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 36-37 (2010). Such an abuse of discretion occurs only if no reasonable person would take the view adopted by the trial court. *Foley v. Fletcher*, 361 Ill. App. 3d 39, 46 (2005).

¶ 17     Pursuant to written discovery, Beck disclosed that he and Soden each disagreed with Fortson's opinion that the standard of care required Beck order or place an NG tube in Melvin or otherwise decompress his abdomen. Plaintiffs contend, however, that these disclosures did not reveal the specific basis for their opinion, thus rendering their testimony violative of Rule 213. We disagree.

¶ 18     Beck disclosed his and Soden's "education, training and experience" as the basis for their anticipated opinion testimony and also disclosed that they had reviewed Melvin's medical file and Fortson's opinion. *Davis v. Kraff*, 405 Ill. App. 3d 20, 38 (2010) ("[e]xpert testimony is admissible if the proffered expert is qualified by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence" (internal quotation marks omitted)); *cf. Chapman v. Hubbard Woods Motors, Inc.*, 351 Ill. App. 3d 99, 110 (2004) (the trial court did not abuse its discretion in disallowing the testimony when the basis provided was a "catch-all" provision, unconnected with any specific witness or opinion). Plaintiffs' counsel apparently did not ask any more detailed questions about the bases of this opinion at deposition, despite the fact that it contradicted their central theory of the case. Based upon our review of the record, the opinions of Beck and Soden regarding the lack of indication for the use of an NG tube were rather clearly disclosed. In that sense, this case is analogous to *Spaetzel*, 393 Ill. App. 3d at 813. In *Spaetzel*, during pretrial discovery the defendants disclosed the "general opinions" that their defense expert would testify to during trial. Citing the logical corollary rule, the reviewing court determined that these general opinions were sufficient to put the plaintiffs on notice regarding the details that emerged during testimony at trial. *Id.* We find the same is true here. Contrary to plaintiffs' interpretation of Rule 213, we note it "is intended to be a shield to prevent unfair surprise but not a sword to prevent the admission of relevant evidence on the basis of technicalities." Ill. S. Ct. R. 213(k), Committee Comments (adopted Mar. 28, 2002); *Clayton v. County of Cook*, 346 Ill. App. 3d 367, 377 (2003).

¶ 19     Taking a slightly different tack, plaintiffs also contend that the disclosures failed to mention any opinion regarding whether an NG tube would have prevented the later perforation. This contention is meritless, as the description of the anticipated trial testimony clearly put plaintiffs on notice that Soden and Beck would testify to the inefficacy of the NG tube. Soden was disclosed as disagreeing "with Dr. Fortson that *any deviation* by Dr. Beck

contributed to cause the patient's right colon perforation." (Emphasis added.) According to the record, Beck notified plaintiffs that Soden was expected to testify that "no action or inaction on [Beck's] part including failure to place an NG tube obviously contributed to cause any injury" to Melvin. Based on these disclosed opinions, it is undeniable that testimony regarding compliance with the standard of care regarding the NG tube, opinions regarding the absence of any proximate causation and the wholly innocuous tube demonstration were all logical corollaries of the pretrial disclosures. See *Skubak v. Lutheran General Health Care Systems*, 339 Ill. App. 3d 30, 39 (2003) (the trial court did not abuse its discretion in allowing the testimony when the record showed that the witnesses' opinions were disclosed in the Rule 213 interrogatories filed by the defendant, and additional comments were permissible as an elaboration).

¶ 20      Moreover, plaintiffs fail to cite any relevant law for the proposition that *all* opinion testimony must be disclosed during discovery depositions and we need not consider this contention further. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); *Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 804 (2009) (this court has held that the failure to elaborate on an argument or cite persuasive and relevant authority results in waiver of that argument). Further, plaintiffs have not in any way shown how they were prejudiced by the opinion testimony or the rather matter-of-fact, in-court demonstration of the NG tube placement. See *Simmons v. Garces*, 198 Ill. 2d 541, 566-67 (2002) (where it appears that an error did not affect the outcome below, or where the court can see from the entire record that no injury has been done, the judgment or decree will not be disturbed). Thus, the trial court did not abuse its discretion in any way on these issues.

¶ 21      Plaintiffs next contend that the trial court abused its discretion by dismissing a juror named Ms. London based on her religious beliefs. Plaintiffs' claim is based upon the following facts. One of Beck's attorneys reported to the trial court that she had seen Ms. London approach Loleather, and Ms. London said, "bless you," on her way out of the courtroom, even though the court had specifically instructed the jury not to communicate directly with the parties and counsel. Beck moved for a mistrial. After careful consideration, the trial judge denied the motion, but held a hearing outside the presence of the jury to determine whether Ms. London should be disqualified from jury service.

¶ 22      At this hearing, the trial court's law clerk Yves Saincilaire testified under oath that during a sidebar she observed Ms. London give the "thumbs up" sign to plaintiffs, who smiled back. Ms. London then testified that she "always [said] God bless you" to everyone. She further explained that it meant "for people [to] always stay encouraged, just stay encouraged, and know God [was] in control of everything." She also noted that she listened to Loleather's testimony about life with Melvin and it "hurt" Ms. London because of Melvin's condition. In regards to the "thumbs up gesture," she said, "I always do this, like I'm giving it to God." She failed to remember if she looked at plaintiffs directly. When asked by the court how Ms. London would deal with something in the law being contrary to the teachings in the Bible, she said that she "[would] pray about it." But she did indicate that "the Bible [said] to obey those who have rule over you no matter what. So I have to obey [the court]."

¶ 23      Defense counsel Sherri M. Arrigo alleged that she saw Ms. London "nodding" in agreement during Loleather's testimony. Arrigo also heard Ms. London say, "yes, that's right" and "you know that's right," around the time Loleather testified about her faith. Ms. London testified that she did not remember, but may have said it.

¶ 24    Following argument, the trial court disqualified Ms. London as a juror because she disobeyed the court in her direct and indirect communication with plaintiffs. In addition, the court noted being troubled by evidence that Ms. London verbally commented during Loleather's testimony and that she had a Bible with her in the jury box. Ultimately, the court was concerned about whether Ms. London was "going to follow the jury instructions and then wait until the conclusion of evidence and discuss the case with [her] fellow jurors with a desire to try to come to some decision." The court believed that discharging her was the only way to ensure both parties a fair trial.

¶ 25    Plaintiffs contend that her dismissal was reversible error. The trial judge determines whether jurors have been influenced and prejudiced to such an extent that they would not, or could not be fair and impartial, and this determination will not be disturbed absent an abuse of discretion. *In re Commitment of Curtner*, 2012 IL App (4th) 110820, ¶ 21. A juror may only be discharged upon a showing of good cause, and *prejudice must be shown* in order to warrant reversal. *Addis v. Exelon Generation Co.*, 378 Ill. App. 3d 781, 791 (2007).

¶ 26    Our detailed review of the record demonstrates that the trial court did not directly dismiss Ms. London for her religious beliefs and, as such, we find plaintiffs' contrary assertion to be simply inaccurate. The record demonstrates that our learned colleague acted prudently because he believed that discharging Ms. London was the only way to ensure a fair trial for both parties. Putting aside any suggestion of a motive malevolent to defendant, it is inarguable that Ms. London disobeyed a specific court order by directly and indirectly communicating with plaintiffs. We cannot say that the trial court abused its discretion, especially in light of the fact that the parties had selected two alternate jurors. In addition, plaintiffs supply nothing but speculation to demonstrate any prejudice by the trial court's removal of Ms. London from jury duty. Thus, we find no abuse of discretion. See *Eskew v. Burlington Northern & Santa Fe Ry. Co.*, 2011 IL App (1st) 093450, ¶¶ 65-66 (the party challenging the jury verdict must establish prejudice by showing that the conduct directly influenced the verdict).

¶ 27    Plaintiffs' final claim of error relates to the trial court's decision to give a "sole proximate cause" instruction, as contained in IPI Civil (2012) No. 12.04. Known in trial parlance as the "empty chair defense," this instruction can be properly utilized to point to the conduct of another "actor" as being the sole responsible cause for an injury. In the case *sub judice*, plaintiffs urge reversal because the court presented the jury with the second paragraph of the pattern instruction, which states, "if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant [Dr. Beck], then your verdict should be for the defendant [Dr. Beck]." *Id.* In this regard, plaintiffs claim that the jury could have been confused by this instruction in light of the fact that the evidence at trial pointed to two different medical doctors, Beck and the later-arriving Ganju, for allegedly failing to provide the same sort of indicated treatment of placing an NG tube in Melvin. The failure of two separate actors, acting at two distinct times cannot logically point to another person being the "sole" proximate cause of the injuries suffered by Melvin.

¶ 28    Sole proximate cause is a valid defense in a medical negligence lawsuit if there is evidence that tends to establish that the conduct of something or somebody other than the defendant was solely responsible for plaintiff's injuries. *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 105 (1997). Beck did not present evidence or specifically argue that any particular person may have been solely to blame for Melvin's injuries, but his lawyer did argue that *if* the jury accepted plaintiffs' theory that Beck could be negligent for failing to insert an NG tube, which could

have prevented Melvin's bowel perforation, then the jury should consider whether the conduct of Ganju could be the sole proximate cause of the perforation. Plaintiffs also point out that Beck specifically told the jury that the defense would not implicate any other doctor for causing Melvin's injuries. The defense responds that it did not claim that Ganju was negligent; it merely suggested that the jury could find that his conduct (which is alleged to have been the same as Beck's) was the sole cause even if not shown to be negligent, citing *McDonnell v. McPartlin*, 192 Ill. 2d 505, 514 (2000).

¶ 29     Beck correctly cites *McDonnell* for the proposition that the sole proximate cause instruction can be given even in the *absence* of any proof that the other "actor" alleged to be the sole proximate cause of the injuries was arguably *negligent*. There is ample precedent for the lack of a requirement that a defendant seeking this instruction point to any proof of *negligence* on the other person's part. At the same time, it is nonsensical to claim that identical courses of medical conduct by two different physicians occurring at two distinct time periods could lead to the legal conclusion that the later of the two doctors would be the sole proximate cause of the injury. Illinois does not recognize "last clear chance" as a viable theory in any personal injury case, much less a medical negligence case. *Cf. Alvis v. Ribar*, 85 Ill. 2d 1 (1981) (generally discussing the abolished doctrine of "last clear chance"). Put more directly, one person cannot be solely responsible for causing an injury when his predecessor allegedly failed to act in the same manner for a number of days prior to the later doctor's arrival on the medical scene. See *Clayton v. County of Cook*, 346 Ill. App. 3d 367, 388 (2003). In *Clayton*, the defendant presented multiple medical theories on what may have caused the patient's death, including several disease processes which were already in existence when they treated the decedent. On appeal, this court held that such evidence could not establish *sole* proximate cause. *Id.* Similarly, in this case, pointing to evidence about how another medical doctor could be the causal factor in the same manner as Beck was alleged to have been negligent does not in any way implicate sole proximate cause, by definition. We conclude that the trial court's granting of the second paragraph of IPI Civil (2012) No. 12.04 was in error.

¶ 30     Having found error, we must then consider whether this instruction prejudiced plaintiffs to warrant reversal and retrial. Our review of the record suggests that there was no such prejudice. First, nothing other than speculation supports the conclusion that this one sentence from the court's instructions to the jury sowed any confusion in the jury's deliberations. Second, the jury could have simply decided that defendant was not negligent, which was the overarching theme of his defense at trial. If that were the case, the jury would never reach the question of proximate cause. See *Tabe v. Ausman*, 388 Ill. App. 3d 398, 402-03 (2009).

¶ 31     In *Tabe*, the trial court granted the plaintiff's motion for a new trial after deciding that it had erroneously given the sole proximate cause instruction. There, the trial court was concerned about the propriety of giving the instruction based on the content of defense counsel's closing argument which indicated that a defendant was misled by the failure of a radiologist to inform him of a negative finding on review of a radiological study. After the jury returned a verdict in defendants' favor, the trial court granted plaintiff a new trial on posttrial motion. On appeal, this court found that the decision to grant a new trial was erroneous because, *inter alia*, "the circuit court should have first considered whether the jury's verdict could be explained by a finding of no negligence ***. If there was no negligence, then instructing on sole proximate cause did not matter." *Id.* at 404.

¶ 32    Similarly, since the jury here returned a general verdict with no special interrogatory designed to test that verdict on this singular issue, we are unable to find reversible error on this limited issue. At the risk of stating the obvious, this case was vigorously defended on both negligence and causation and the jury's verdict is amply supported by evidence that Beck was not negligent in his management of this patient, which would mean that the jury would never reach the issue of causation. The trial court's error in this regard was harmless, based on this record.

¶ 33                                CONCLUSION
¶ 34    Based on the foregoing, we affirm the judgment of the circuit court of Cook County.

¶ 35    Affirmed.