# Illinois Official Reports

## Appellate Court

***People v. Holliday*, 2020 IL App (5th) 160547**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARIUS HOLLIDAY, Defendant-Appellant. |
| District & No. | Fifth District<br>No. 5-16-0547 |
| Rule 23 order filed<br>Motion to<br>publish allowed<br>Opinion filed | February 19, 2020<br><br>March 3, 2020<br>March 3, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Marion County, No. 16-CF-188; the Hon. Allan F. Lolie, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Ellen J. Curry, and Lawrence J. O'Neill, of State Appellate Defender's Office, of Mt. Vernon, for appellant.<br><br>Bill J. Milner, State's Attorney, of Salem (Patrick Delfino, Patrick D. Daly, and Sharon Shanahan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.
Presiding Justice Welch and Justice Boie concurred in the judgment and opinion.

## OPINION

¶ 1     The defendant was convicted by a jury of two counts of aggravated battery with a firearm and sentenced to two concurrent terms of 30 years in prison, with 3 years of mandatory supervised release. On appeal, the defendant challenges his conviction, claiming that the circuit court abused its discretion in denying his motion to discharge the jury, that photographs admitted into evidence were not properly authenticated by the State, and that the State improperly used a prior consistent statement of a complaining witness to bolster his credibility. For the following reasons, we affirm.

¶ 2                                    BACKGROUND

¶ 3     On June 8, 2016, the State charged the defendant, by information, with one count of aggravated battery in that the defendant, in committing a battery in violation of section 12-3(a)(1) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/12-3(a)(1) (West 2016)), knowingly caused bodily harm to Devale L. Johnson by discharging a firearm and caused injury to Devale, in that bullets fired by the defendant struck Devale in the leg and buttocks, in violation of section 12-3.05(e)(1) of the Criminal Code (*id.* § 12-3.05(e)(1)). The information further charged the defendant with one count of aggravated battery in that the defendant, in committing a battery in violation of section 12-3(a)(1) of the Criminal Code (*id.* § 12-3(a)(1)), knowingly caused bodily harm to Juan R. Hayes by discharging a firearm and caused injury to Juan, in that a bullet fired by the defendant struck Juan in the leg, in violation of section 12-3.05(e)(1) of the Criminal Code (*id.* § 12-3.05(e)(1)).

¶ 4     On October 4, 2016, before trial, the parties filed a stipulation of evidence in reference to, *inter alia*, an exhibit containing three Facebook photographs. The stipulation provided as follows:

    "The Parties hereby stipulate to the foundation regarding a page containing three photographs of the defendant. The Parties have agreed that all writing will be removed from said page, and that testimony regarding the contents of said writing will be barred. To the extent testimony is adduced regarding the origin of the photograph[s], the People's witness([e]s) will be instructed only to state that [they] came from a Facebook page possibly believed to be that of the defendant."

¶ 5     A jury trial was conducted on October 5 and 6, 2016. During *voir dire*, the circuit court held an in-chambers conference with counsel, the defendant, and Officer Peebles from the Centralia Police Department. There, Officer Peebles indicated that he was aware of a telephone call originating from the Marion County jail. The call was made by the defendant to an individual named Therion, with whom Peebles was familiar because he had "arrested him several times." Peebles testified that the telephone call was recorded. During the telephone call, the defendant indicated that he was "worried about nothing but the guy who put him ***
there." Therion told the defendant, "Don't worry, man, because I'm trying to *** get it taken

care of right now." Peebles informed the circuit court that the call invoked concern that "he was going to try to in some way intimidate the victim in the case."

¶ 6    The circuit court advised that Detective Decker reported inappropriate behavior at the courthouse that day by individuals who were removed from courthouse property. Peebles responded that said events transpired downstairs. He reported that while Devale—one of the alleged victims in the case—was entering, Therion and another individual named Javonte Simms were there and, instead of walking around Devale, "tried to walk through him in a way to intimidate him." Peebles added that Therion and Simms were required to leave, as it was "clearly a tactic to try to intimidate Mr. Johnson."

¶ 7    The state's attorney indicated that, when questioned about the situation, Devale reported that "there was slight contact, but nothing *** major." The state's attorney further reported that Detective Uhls also witnessed the event and reported that one of the individuals seemed to whisper something in Devale's ear before being pulled away by officers. Officer Peebles added that the events transpired just as the witnesses were arriving at the courthouse. When asked if there were any potential jurors present during the incident, Peebles responded, "I'm thinking court was going on, but I can't guarantee it." The state's attorney indicated that "it appeared all prospective jurors were still inside being questioned[,] [s]o I don't think anyone would have been downstairs." The assistant state's attorney interjected, however, that she received a text message indicating that a juror had witnessed the situation. The circuit court advised that a general inquiry of the jury panel would be made as to whether anything had occurred that morning that they wished to report to the court. No objections were made by either party.

¶ 8    After *voir dire* was concluded and the jury was selected, the circuit court conducted another in-chambers conference. There, the circuit court indicated that, after the prior in-chambers conference concluded, Detective Decker informed the court that people who were wearing jury badges were observed downstairs when the incident occurred. The circuit court stated that the jury would be asked general questions and added that "I'm not going to allude to anything. *** I don't want to draw any undue attention to this. I don't want *** the defendant to be prejudiced in any way, but I also want to make sure I don't have jurors[ ] who may feel intimidated for some reason."

¶ 9    Upon returning to the courtroom, the alternate juror was selected, and other potential alternate jurors were excused. Subsequently, the circuit court called a recess and went on the record in chambers again with counsel and the defendant. The circuit court stated that the jurors would be questioned about the incident before being sworn in. Counsel had conferred with the circuit court prior to going on the record and had reached an agreement regarding how to frame the question to the jurors. Defense counsel replied that there was no objection to the circuit court questioning the jury as agreed.

¶ 10    The circuit court indicated: "I just wanted to make sure that hasn't planted any seeds that would make it difficult to give [the defendant] a fair trial." The assistant state's attorney replied:

> "[T]he parties['] concern is that the possible jurors may not realize it's at all related to this and would not realize it until a witness involved in it came into the courtroom to testify. I think that's the concern, but pointing it out would then of course immediately prejudice [the defendant]. So we're trying to avoid that as well."

The circuit court asked defense counsel if there was anything he wanted to add, to which he replied, "Not at this time, Your Honor."

¶ 11 Upon reconvening in the courtroom and before swearing in the jurors, the circuit court questioned the jury as follows: "Since you've been in the courthouse today have you witnessed anything outside of the courtroom that caused you concern or caused you any difficulty here today? If so, raise your hand." The circuit court added, "And has anyone tried to discuss this case with you in any way today? If so, raise your hand." The circuit court then observed, "Everyone indicates negatively." When offered, neither counsel had anything to add.

¶ 12 After the foregoing questioning and before the jury was sworn, a sidebar conference was conducted, where defense counsel moved to discharge the entire panel and to continue the trial based on concerns about what the jurors may or may not have seen downstairs. Defense counsel added, "There's no way even with your questioning of telling what they have seen, and they might not even realize they saw something that could be related to this case until the witness actually shows up on the stand." The circuit court denied the motion, observing that the court had just met with counsel in chambers and all had agreed with the method of questioning the jurors. The circuit court added, however, that "[i]f something would arise later in the trial, I would reevaluate this ruling."

¶ 13 After the jury was sworn, Devale took the stand and testified that he was 19 years old and had resided in Atlanta, Georgia, for the last couple of years. In June 2016, he was staying with family members in Centralia. On June 5, 2016, Devale received a telephone call from his cousin, Caprice, who was crying because she was riding her bicycle and two men were following her. Caprice gave a physical description of the men. Accordingly, Devale, accompanied by his cousins and Caprice's brothers, Kiwan and Jeff, set out to look for the men. Devale testified on cross-examination that it was after 9 p.m. at this time. Devale, Kiwan, and Jeff went to Laura Leake Park and saw two men matching Caprice's description. Both men were riding bicycles. Devale testified that one of the men was light-skinned with dreadlocks and the other man did not have dreadlocks. Devale indicated that he had never seen either of the men before.

¶ 14 Devale testified that he, Kiwan, and Jeff approached the two men, and Devale asked them if they had been following a girl on a bicycle. Devale testified that the men denied doing so and informed him they did not like how he walked up to them and that they "don't take no disrespect." Devale testified, "I said something back then I walked." Devale then heard Kiwan say, "He got a gun." Devale testified that he turned around and saw that the man without dreadlocks had a gun. Devale told the man, "[Y]ou shoot me, you better kill me." Devale testified that the man began shooting and the first bullet "went right beside me." He explained, "I think I got a little graze mark." Devale testified that he "took off running after that" and attempted to "zigzag" and take cover behind a white SUV-type truck. He testified that he heard bullets coming and got shot in the leg and hip. Devale testified that, after being shot, he proceeded to the white SUV and took cover inside in the backseat. At the time, he did not know who owned the white SUV. He indicated that his uncle arrived and transported him to the hospital shortly after the shooting.

¶ 15 People's Exhibit 1 was introduced to Devale, who identified it as a DVD. The DVD contained recordings from the surveillance video from the Marion County Housing Authority (MCHA) property adjacent to the park and depicted a recording of the events on the night of the shooting. Devale testified as the DVD was played for the jury. After the DVD concluded,

Devale reiterated that he had never seen the two men before the night in question. He agreed that he was standing close enough to see the face of the man who shot him.

¶ 16    After the incident, Devale recalled people discussing who the shooter was but testified that "when I seen [*sic*] the pictures, I already knew who it was." Devale added that his cousins knew who the suspect was and referred to him as "D Rice." Devale affirmed that, after hearing the name of the suspect, he went online to verify that the name he was given was in fact the person who shot him. He testified that he found photographs on Facebook and recognized the person in the photographs as the defendant. Devale explained that his cousin showed him a Facebook photograph depicting the defendant holding a gun. Devale testified that the gun in the photograph "was the same exact gun that I got shot with."

¶ 17    People's Exhibit 2—which was admitted via stipulation the day before trial—was introduced to Devale, who identified the exhibit as the photographs he saw online. He identified the individual in the photographs as the defendant, identified the defendant in the courtroom as the individual in the photographs, and confirmed that the gun in the photographs was the "[s]ame exact one." The circuit court noted on the record that People's Exhibit 2 was admitted without objection.

¶ 18    Devale testified that, two days after he was shot, detectives from Centralia Police Department came to his aunt's house where he was staying. The detectives showed Devale three photograph lineups. People's Exhibit 3 was admitted into evidence, which Devale identified as photograph lineup number one. Devale testified that, in that lineup, he identified the person with the number three over his head as the defendant. When the detectives asked him if he knew who it was, he responded that he did not know him, but "I know his Facebook page." Accordingly, Devale opened his phone and shared the Facebook photograph with the detectives. Devale identified the defendant in the courtroom as the person he identified in the lineup. The other two lineups were admitted into evidence as People's Exhibits 4 and 5. Devale identified the exhibits and testified that he made no identifications in either lineup. Devale admitted that he has five pending felony counts of aggravated assault against him in Georgia but denied being offered any leniency in exchange for testifying in the instant trial.

¶ 19    Kiwan Brown testified that he is 13 years old and in the eighth grade. He testified that Devale is his older cousin. Kiwan recalled going to Laura Leake Park on June 5, 2016, with his older brother, Jeff, and Devale to look for some people. He confirmed that his older sister, Caprice, had been afraid and upset that evening. Kiwan testified that he, Devale, and Jeff approached two men who were on bicycles and asked them if they had been following Caprice. He indicated that the men matched the description Caprice had given. Kiwan testified that one of the men had dreadlocks and the other had an Afro. When asked whether he saw either of the two men holding a gun, he responded affirmatively. Kiwan testified that he heard gunshots and began running. He indicated that the man with the dreadlocks ran after him, but he was able to find a safe place and call for help.

¶ 20    Kiwan testified that, two days later, detectives came to his house and showed him three photograph lineups. Kiwan testified pursuant to People's Exhibit 3, that he identified person number three in that lineup as the individual who shot Devale. People's Exhibits 4 and 5 were then shown to Kiwan. He indicated that he did not pick out anyone from the second lineup but reported that he picked out person number four from the third lineup as the man with the dreadlocks.

¶ 21    Kiwan testified on cross-examination that when he, Devale, and Jeff arrived at Laura Leake Park, he stood back while Devale approached the men. He confirmed that he had seen the man with dreadlocks around town before, but he had never seen the man with the Afro before that night. Kiwan indicated that the man with the Afro had a gun that came out of a book bag that the man with dreadlocks was carrying. He testified that he began to run when he saw the man with the Afro point the gun at Devale. Kiwan reiterated that he did not know the name of the shooter, but the next day he began hearing rumors that a man named "D Rice" may have been involved.

¶ 22    When questioned whether he and Devale had discussed the incident before the police arrived at the house, Kiwan replied, "Not really." He further denied looking at any photographs on Facebook. Kiwan testified that, after the lineup, the officer asked him if he knew the shooter and he replied that he had heard what his name might be. Kiwan stated that he and Devale were in separate rooms while the police were showing them the photograph lineups.

¶ 23    Katherine Taylor testified that Juan is her husband. She testified that on the evening of June 5, 2016, she and Juan drove their white Ford Explorer to Laura Leake Park in Centralia. She testified that once the vehicle was parked, Juan got out of the vehicle and she heard gunfire. Juan began yelling at her to "get down." She indicated that she saw Juan and another man running toward the vehicle and she "kind of ducked down at that point because the gun fire was still going on." Katherine testified that when Juan got to the truck, he jumped on top of her and the other man jumped in on the other side, and "when [Juan] jumped on top of [her] he got shot." She indicated that, at the time of the events, she did not know the other man who jumped in the vehicle.

¶ 24    Andrew Harvard testified that he is employed as an officer for the Centralia Police Department. Harvard was on duty at approximately 9:15 p.m. on the evening of June 5, 2016, and was dispatched to Laura Leake Park to respond to a reported shooting in that area. Harvard testified that, when he arrived at the park, he observed a white Ford Explorer. As he approached, he noticed a black male—later learned to be Juan—sitting on the passenger side of the vehicle and screaming that he had been shot. Harvard testified that he inspected the injury and noticed "a handgun caliber gunshot wound." Harvard testified that Juan was treated and transported from the scene by ambulance.

¶ 25    Steve Hulen testified that he is employed as a crime scene investigator for the Illinois State Police. On June 5, 2016, he was requested to go to Laura Leake Park. He arrived at the scene around 11:30 p.m., as it took him nearly two hours to drive there. Once he arrived, he was given initial information, and he photographed the scene, did a rough sketch, and collected evidence. Hulen testified that, as he photographed, he focused on a white Ford Explorer that was parked on the west side of the park, as well as a shelter area located in the northwest corner of the park. Hulen indicated that he, along with the Centralia Police Department, looked for shell casings at the scene, but none were recovered.

¶ 26    Blaine Uhls testified that he is employed as the sergeant over the detective division of the Centralia Police Department. He was on duty on the evening of June 5, 2016, when he responded to the scene at Laura Leake Park. Uhls testified that, upon arrival, he and the patrolmen began "walking in a grid fashion" using flashlights to light the area. They walked back and forth looking for shell casings. Uhls explained that shell casings can identify the weapon used and its caliber. Uhls affirmed that there are situations where gunfire occurs but shell casings are not found. He explained that firing a "lock breach gun like a single-shot or a

revolver" will result in an absence of shell casings because, in that type of firearm, the shell casings remain in the cylinder after each shot. He further explained that the cylinder rotates to the next round and the process is repeated. Once the rounds are spent, the casings remain housed inside the cylinder. Uhls testified that no casings were found at the scene, notwithstanding multiple officers engaging in the search "numerous times from different hang angles."

¶ 27　　Uhls testified that the MCHA property borders three sides of Laura Leake Park. The police department obtained video surveillance footage from the MCHA that was recorded on the evening in question. Uhls indicated that the police department requested and received a one-hour block of the footage that encompassed the relevant time period. Uhls testified as the video—People's Exhibit 1—was shown to the jury. At one point, Uhls noted that the shooter was "holding his left arm out, fully extended to what appears to be a pistol in his hand." Uhls further noted another male with long dreadlocks who was seated on a bicycle next to the shooter.

¶ 28　　Uhls testified that he and Detective Dukes prepared photograph lineups for Devale and Kiwan to review. Uhls indicated that Devale and Kiwan were not in the same room when they were shown the lineups. The State asked Uhls if Devale said anything about what he had seen online. Uhls replied that after Devale was shown the lineups and identified the shooter, Devale told him about a Facebook photograph of the individual and showed the photograph to Uhls. Defense counsel did not object to this line of questioning or testimony. People's Exhibit 2 was shown to Uhls, who identified the individual in the photographs as the defendant. Uhls indicated that, in one of the photographs, the defendant is holding what looks to be a revolver in his left hand. On cross-examination, defense counsel asked Uhls if he questioned Devale about the gun the shooter used. Uhls repeated that Devale showed him the Facebook photograph on his phone and indicated that the gun depicted in the photograph was the one he was shot with.

¶ 29　　Uhls testified that, although bicycles are visible on the surveillance video and were seen by witnesses, no bicycles were found at the scene. Uhls further acknowledged that no book bag was seen in any of the still photographs that were derived from the surveillance video. Uhls testified that Devale informed him that he had never seen the shooter before the night in question and told him that he heard the shooter's nickname was "D Rice." The State then asked Uhls if Devale was questioned about the firearm after being shown the lineups. Uhls replied in the affirmative.

¶ 30　　Uhls agreed that Devale, Kiwan, and Jeff were all at the park together, but Jeff did not wish to speak to the officers. Uhls confirmed that Kiwan also identified the defendant as the shooter and identified the man with the dreadlocks as the individual who accompanied the shooter that night. Kiwan informed Uhls that he had previously seen the man with dreadlocks around town but had never seen the shooter before.

¶ 31　　On the second day of trial, after the jury was brought in and before testimony began, the circuit court asked the jury: "First of all, does anyone have anything to report? *** If so, raise your hand." After no juror raised their hand, Blake Dukes took the stand and testified that he is employed as a detective with the Centralia Police Department and was on duty the evening of June 5, 2016, when he responded to the shooting in Laura Leake Park. As a follow-up to the investigation, Dukes had prepared three photograph lineups that he showed Devale and Kiwan on June 7, 2016. Dukes testified that, in lineup number one, Devale identified the individual in

the number three position as the shooter. Dukes added that Devale did not identify anyone from photo lineups two and three.

¶ 32    Dukes testified that he followed the same procedure in showing Kiwan the lineups. Dukes reported that in lineup number one, Kiwan picked out individual number three as the shooter. Dukes added that Kiwan did not identify anyone in lineup number two, but in lineup number three, he identified the fourth individual as Devarus Mitchell, who accompanied the shooter that night. Dukes learned that Kiwan was familiar with Devarus Mitchell by seeing him around the area. Dukes confirmed that Devale and Kiwan were separated and had no contact with each other while they were being shown the lineups.

¶ 33    After deliberations, the jury found the defendant guilty on both counts of aggravated battery with a firearm, and the circuit court entered judgment on the verdict. On October 12, 2016, the defendant filed a posttrial motion for judgment notwithstanding the verdict or, in the alternative, a new trial. On October 25, 2016, after a hearing, the circuit court denied the motion. On December 20, 2016, the defendant was sentenced to two concurrent terms of 30 years in prison, with 3 years of mandatory supervised release. The defendant filed a timely notice of appeal.

¶ 34                                                          ANALYSIS

¶ 35    The defendant raises the following issues on appeal, which we restate as follows: (1) whether the circuit court's denial of the defendant's motion to discharge the jury deprived the defendant of an impartial jury and fair trial, (2) whether the exhibit containing the Facebook photographs of the defendant that was admitted into evidence via stipulation was properly authenticated, and (3) whether the State improperly used prior consistent statements of Devale to bolster his credibility.

¶ 36                                              I. Motion to Discharge Jury

¶ 37    The first issue on appeal is whether the circuit court's denial of the defendant's motion to discharge the jury deprived the defendant of an impartial jury and fair trial. "It is inherent in a defendant's right to a fair trial that he receive a trial by an impartial jury free from outside influence." *People v. Perez*, 98 Ill. App. 3d 64, 67 (1981). "A mistrial is necessary when it appears that the jury was so influenced and prejudiced that it could not have been fair and impartial and that the damaging effect could not be cured by admonitions and instructions." *People v. Clark*, 231 Ill. App. 3d 571, 574-75 (1992). "The trial judge determines whether jurors have been influenced and prejudiced to such an extent that they would not, or could not be fair and impartial, and this determination will not be disturbed absent an abuse of discretion." *Jones v. Beck*, 2014 IL App (1st) 131124, ¶ 25. "A juror may only be discharged upon a showing of good cause, and *prejudice must be shown* in order to warrant reversal." (Emphasis in original.) *Id.*

¶ 38    Here, the defendant argues that the circuit court abused its discretion in denying his motion to discharge the jury because the disturbance in the courthouse hallway tainted the jury in that the attempted intimidation and harassment of Devale implied a consciousness of guilt and may have intimidated the jurors. We disagree. This argument is unfounded, as it is not supported by evidence that any of the selected jurors *actually witnessed* the disturbance. The defendant cannot establish the requisite prejudice resulting from the incident without first providing evidence that any of the jurors in fact witnessed it.

¶ 39    At the in-chambers conference, when the circuit court asked whether any potential jurors witnessed the incident, mixed responses were received. Officer Peebles stated, "I'm thinking court was going on, but I can't guarantee it." The state's attorney responded that it appeared that all prospective jurors were still inside being questioned. However, the assistant state's attorney reported receiving a text message indicating that a potential juror had witnessed the disturbance. Moreover, at the second in-chambers conference, the circuit court indicated that Detective Decker had observed individuals downstairs wearing jury badges when the incident occurred.

¶ 40    Notably, the disturbance arose during *voir dire*, before jury selection was complete. Accordingly, any individuals in the vicinity of the disturbance were only *potential* jurors, resulting in, at most, a mere *possibility* that any members of the jury panel that was ultimately selected actually observed the incident. Notwithstanding this possibility, there is no evidence in the record that any of the selected jurors did, in fact, witness the incident. Indeed, the evidence in the record supports a contrary conclusion. After the panel was selected and before being sworn in, the circuit court instructed the individuals of the jury to raise their hand if any had witnessed anything in the courthouse and outside of the courtroom to cause them any concern or difficulty. No juror raised their hand.

¶ 41    Likewise, on the second day of the trial and after Devale had testified, the circuit court asked the jurors if they had anything to report. Again, no hands were raised. This leads to the conclusion that none of the jurors witnessed what had occurred. Even if we were to assume, *arguendo*, that a juror actually *did* witness the event, there is no evidence that anything he or she saw caused difficulty or concern, as no juror raised his or her hand indicating such when prompted by the circuit court on both days of the trial. We further note that Devale, who encountered the two individuals in the hallway, indicated that there was "slight contact but nothing major." Detective Uhls reported that one of the individuals seemed to whisper something in Devale's ear.

¶ 42    Notably, the circuit court was meticulous to question the jury in such a way as to not prejudice the defendant, while at the same time ensuring that no jurors felt intimidated. At the in-chambers conference, counsel and the circuit court agreed on the wording of the question and no objections were made by either party. Moreover, the circuit court indicated that its ruling to deny the motion to discharge the jury would be reevaluated if any issues arose later in the trial, thereby ameliorating the concern that members of the jury who potentially saw the disturbance may not realize anything pertinent to the trial had occurred until Devale took the stand and testified. As noted, in order to put that possibility to rest, the circuit court asked the jury on the second day of the trial—after Devale had testified—if anyone had anything to report. Nobody did.

¶ 43    The record establishes that the circuit court carefully exercised adequate precautions to ensure that the defendant was not prejudiced by anything the jury may have witnessed. Prejudice required to reverse the circuit court's decision to deny the defendant's motion to discharge the jury cannot be established by bare speculation. See *id.* There is no evidence to show that any of the jurors saw anything or, if they did, that they were influenced and prejudiced by what they saw to the extent of being incapable of being fair and impartial. See *id.* For these reasons, we conclude that the circuit court did not abuse its discretion in denying the defendant's motion to discharge the jury.

## II. Facebook Photographs

¶ 45   The second issue on appeal is whether the exhibit containing the Facebook photographs of the defendant that was admitted into evidence via stipulation was properly authenticated. At the outset, we note that the defendant waived this issue by failing to object at trial and failing to raise the issue in his posttrial motion. "Ordinarily, a defendant must both specifically object at trial and raise the specific issue again in a posttrial motion ***." *People v. Woods*, 214 Ill. 2d 455, 470 (2005). "If a defendant fails to satisfy either prong of this test, his challenge is considered waived on appeal." *Id.*

> "This rule is particularly appropriate when a defendant argues that the State failed to lay the proper technical foundation for the admission of evidence, and a defendant's lack of a timely and specific objection deprives the State of the opportunity to correct any deficiency in the foundational proof at the trial level." *Id.*

This is precisely what occurred in this case. Defense counsel did not object to the foundation of the Facebook photographs at trial, nor would the State have expected him to, as the photographs and their foundation were admitted into evidence by stipulation of the parties the day before the trial. Because no objection was made at trial, the State was deprived of the chance to cure any alleged defect. See *id.* Likewise, the defendant omitted any mention of this issue in his posttrial motion. For these reasons, we find this issue was waived by the defendant.

¶ 46   Waiver notwithstanding, we observe that the defendant went to great lengths in his brief in an attempt to convince this court that the exhibit containing the Facebook photographs was not properly authenticated, arguing that the State presented no foundational evidence to show that the purported Facebook profile actually belonged to the defendant or that the defendant was responsible for these particular photographs. Even assuming, *arguendo*, that the defendant had not waived this issue, we would nevertheless decline to address these arguments because we find the doctrine of invited error applies, as the defendant stipulated to the admission of the Facebook photographs and the foundations thereof that he now complains of on appeal.

¶ 47   The stipulation provides as follows:

> "The Parties hereby stipulate to the foundation regarding a page containing three photographs of the defendant. The Parties have agreed that all writing will be removed from said page, and that testimony regarding the contents of said writing will be barred. To the extent testimony is adduced regarding the origin of the photograph[s], the People's witness([e]s) will be instructed only to state that [they] came from a Facebook page possibly believed to be that of the defendant."

¶ 48   If a party stipulates that evidence is admissible, the need to lay a foundation for the admission of that evidence no longer exists. *People v. Bush*, 214 Ill. 2d 318, 333 (2005). "Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *People v. Carter*, 208 Ill. 2d 309, 319 (2003); see also *People v. Trice*, 2017 IL App (1st) 152090, ¶ 59 (defendant may not argue on appeal that circuit court erred by admitting the very evidence he stipulated to at trial). Indeed, "[t]o permit a defendant to use the exact ruling or action procured in the trial court as a vehicle for reversal on appeal 'would offend all notions of fair play' [citation], and 'encourage defendants to become duplicitous' [citation]." *People v. Harvey*, 211 Ill. 2d 368, 385 (2004) (quoting *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001), and *People v. Sparks*, 314 Ill. App. 3d 268, 272 (2000)). Applied to this case, having stipulated to the foundation and

admission of the Facebook photographs in People's Exhibit 2, the defendant invited any alleged errors and cannot now challenge the foundation and admission of the same on appeal.

¶ 49     In the alternative, the defendant requests this court to review this issue under the plain-error doctrine. We decline to do so, however, as "plain-error review is forfeited when the defendant invites the error." *People v. Harding*, 2012 IL App (2d) 101011, ¶ 17. " '[A] defendant's invitation or agreement to the procedure later challenged on appeal "goes beyond mere waiver." ' " *Id.* (quoting *Harvey*, 211 Ill. 2d at 385, quoting *Villarreal*, 198 Ill. 2d at 227). "The issue is sometimes referred to as one of estoppel." *Id.* The principles of invited error "also apply to preclude plain-error analysis." *Id.* "Where the defendant invited the error, our supreme court has declined to address any related plain-error claim." *Id.* For these reasons, we refuse to review this issue for plain error.

¶ 50     Finally, the defendant asserts an ineffective assistance of counsel claim, contending that his counsel was ineffective for failing to object to the "improper admission" of the Facebook photographs. To succeed on an ineffective assistance of counsel claim, a defendant must show that trial counsel's representation fell below an objective standard of reasonableness and that the defendant was prejudiced by counsel's substandard performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show prejudice, the defendant must establish a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different. *Id.* at 694.

¶ 51     Notably, the defendant does not argue in his opening brief that his counsel was ineffective for agreeing to the stipulation, only that counsel was ineffective for not objecting to the admission of the photographs. Not objecting to admission of the photographs was not only sound trial strategy but also commonsensical, as counsel on both sides stipulated to the admission of the photographs, under certain conditions, the day before the trial. See *People v. Edwards*, 195 Ill. 2d 142, 172 (2001) (matters of trial strategy do not support claims of ineffective assistance of counsel). Counsel's failure to object was not error or oversight, but a rational and expected result of the stipulation entered the day before. It would have been absurd for counsel to object based on a lack of foundation to show that the purported Facebook profile actually belonged to the defendant when counsel had just agreed to the stipulation forbidding any testimony on that very topic, which necessarily entails the writings on the Facebook page. Counsel could not have been expected to object to the admission of the very evidence that he had just stipulated to. Accordingly, counsel's performance did not fall below an objective standard of reasonableness for failure to object to the admission of the Facebook photographs, as not objecting was a matter of trial strategy. See *Strickland*, 466 U.S. at 689; see also *People v. Brown*, 2017 IL App (1st) 150203, ¶ 25 (strong presumption of trial strategy must be overcome to show counsel's performance was deficient).

¶ 52     We are mindful that it was not until the defendant filed his reply brief that he first asserted the argument that his counsel was ineffective for agreeing to stipulate to the admission of the Facebook photographs. The State contends that the defendant waived this argument and cites *People v. Accardo*, 139 Ill. App. 3d 813 (1985), in support of this argument. In *Accardo*, the reviewing court held that the defendant could have anticipated the State's waiver argument, the ineffective assistance of counsel argument advanced by the defendant was not strictly confined to replying to arguments in the appellee's brief, and the defendant's reply brief responded neither factually nor legally to the State's argument that a waiver occurred. *Id.* at 816-17. The court concluded that the reply brief raised a new issue not claimed in the initial

- 11 -

brief in an effort to evade the State's waiver argument. *Id.* at 817. Accordingly, the *Accardo* court held that the issue was waived and refused to consider it. *Id.*

¶ 53    On the other hand, the defendant cites *People v. Maxwell*, 89 Ill. App. 3d 1101 (1980), in which the reviewing court allowed the defendant to add an ineffective assistance of counsel issue by motion after briefing was complete but admonished the defendant that the argument should have been included in the reply brief, as the argument "grows out of and is responsive to the waiver argument made by the State in its appellee's brief." *Id.* at 1104. Here, relying on *Maxwell*, the defendant contends that his argument that his counsel was ineffective for agreeing to the stipulation should be allowed to be raised in his reply brief, as it is related to the claim raised in his initial brief that his counsel was ineffective for failing to object to the admission of the Facebook photographs.

¶ 54    Notwithstanding these waiver arguments, the ineffective assistance of counsel claim fails because we find that the stipulation was strategically crafted, as it was carefully worded to make the admission of the photographs conditional on removing the writing from the Facebook page and forbidding any testimony regarding any writing on the page. The admission was further conditional on limiting witnesses to state that the photographs came from a Facebook page "possibly believed to be that of the defendant." No objections were made at trial regarding any breach of the limitations set forth in the stipulation. For these reasons, we conclude that defense counsel's performance did not fall below an objective standard of reasonableness for stipulating to the admission of the Facebook photographs, as this was a matter of trial strategy. See *Edwards*, 195 Ill. 2d at 172 (matters of trial strategy do not support claims of ineffective assistance of counsel).

¶ 55    Taken one step further, even if we were to assume no trial strategy was involved and counsel's performance was deficient, the defendant's ineffective assistance of counsel arguments still fail, as the defendant did not satisfy the second prong of *Strickland*, establishing that he was prejudiced by counsel's deficient performance. See 466 U.S. at 686. To show prejudice, the defendant must establish a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different. *Id.* at 694. Here, neither defense counsel's agreement to the stipulation nor counsel's failure to object to the admission of the Facebook photographs changed the result of the trial.

¶ 56    Both Devale and Kiwan identified the defendant in the photographic lineups presented by the detectives. Kiwan testified that he did not look at any photographs on Facebook. Moreover, Devale testified that he recognized the defendant in the lineups because he stood close enough to see the face of the man who shot him on the night in question. Devale also identified the defendant in open court. There is ample evidence in the record besides the Facebook photographs to support the defendant's conviction. Accordingly, we cannot conclude that the result of the trial would have been different but for any alleged error of defense counsel regarding the admission of the Facebook photographs. For the foregoing reasons, we find the exhibit containing the Facebook photographs of the defendant that was admitted into evidence via stipulation was properly authenticated.

¶ 57                                    III. Prior Consistent Statements

¶ 58    The final issue on appeal is whether the State improperly used prior consistent statements of Devale to bolster his credibility. The defendant takes issue with the following testimony. First, he cites the testimony of Devale that, after hearing the name of the suspect, he found

photographs on Facebook and recognized the person in the photographs as the defendant. Devale further testified that the gun in the photographs was the same gun he was shot with. Next, the defendant cites the following subsequent testimony of Detective Uhls:

"Q. After Devale was shown his photo lineup, did you ask him questions regarding what the firearm looked like of the person he had identified as the shooter from the photo lineup?

A. Yes, we did.

Q. Did Devale say anything to you about what he had seen online of that person?

A. Yes. He brought up that one he had seen one [*sic*] on Facebook, someone had told him about."

The defendant argues that the State improperly bolstered Devale's credibility by eliciting from Uhls Devale's prior consistent statement. The defendant contends this was prejudicial because the State's case hinged on the believability of Devale's identification of the defendant as the shooter. The State counters that all the statements were admissible as statements of identification.

¶ 59 At the outset, the defendant concedes that defense counsel did not object to the State's elicitation of the prior consistent statement. We add that the defendant failed to raise this issue in his posttrial motion. Accordingly, the defendant has waived this issue. See *Woods*, 214 Ill. 2d at 470 (issue waived unless defendant objects at trial and raises issue in posttrial motion). However, waiver notwithstanding, the defendant requests this court to review this issue for plain error.

¶ 60 The plain-error doctrine "is a narrow and limited exception to the general waiver rule." *People v. Pastorino*, 91 Ill. 2d 178, 188 (1982). The purpose of allowing review under the plain-error doctrine "is to protect the rights of the defendant and the integrity and reputation of the judicial process." *People v. Herron*, 215 Ill. 2d 167, 177 (2005). " '[I]f the admission of evidence constitutes plain error resulting in a miscarriage of justice upon a defendant or a tainting of the integrity and reputation of the judicial process, then it is considered although such error was not brought to the attention of the trial court.' " (Emphasis omitted.) *Id.* at 177-78 (quoting *People v. Baynes*, 88 Ill. 2d 225, 231 (1981)).

"Rule 615(a) provides that if 'substantial rights' are not affected, any such claim 'shall be disregarded.' [Citation.] That language *** mandates that '[b]efore plain error can be considered as a means of circumventing the general waiver rule, it must be plainly apparent from the record that an error affecting substantial rights was committed.' [Citation.] But the threshold concern is just as often as not whether the evidence presented was 'closely balanced.' The reason: the strength or weakness of inculpatory evidence has long been seen as relevant to ignoring procedural defaults in remedying occasioned injustice. [Citation.]" (Internal quotation marks omitted.) *Id.* at 178.

¶ 61 "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 62    The defendant requests this court to consider this issue under the closely balanced prong of the plain-error rule. However, we must first determine if a clear or obvious error occurred. See *id.*; see also *Herron*, 215 Ill. 2d at 178. "Generally, a witness's prior consistent statements are inadmissible to corroborate the trial testimony of that witness because they serve to unfairly enhance the witness's credibility." *People v. Temple*, 2014 IL App (1st) 111653, ¶ 34. "However, this rule does not apply to statements of identification." *Id.* Section 115-12 of the Code of Criminal Procedure of 1963 (Code) provides the following regarding the substantive admissibility of prior identification: "A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2016).

¶ 63    In *Temple*, 2014 IL App (1st) 111653, ¶ 1, the defendant contended that the trial court erred by admitting prior consistent statements of witnesses. Observing section 115-12 of the Code, the *Temple* court concluded that the witnesses all testified at trial and were subject to being cross-examined. *Id.* ¶ 41. The court further found that the witnesses' statements regarding the description of the defendant were statements regarding the steps in the identification process and were, therefore, properly admissible as statements of identification. *Id.* Moreover, the testimony of police officers regarding the prior consistent statements of identification made by the witnesses was found to be admissible under section 115-12 of the Code. *Id.* ¶ 42. The court concluded that, because the witnesses' statements were admissible under section 115-12, the police officers' testimony *about* the same statements was also properly admitted. *Id.*

¶ 64    Applied to this case, Devale's testimony about finding photographs on Facebook, recognizing the subject in the photographs as the defendant, and recognizing the gun in the photograph as the one he was shot with was admissible as statements of identification. See *id.* ¶ 41. Moreover, we find Detective Uhls's testimony regarding Devale's prior consistent statements is also admissible as statements of identification under the purview of section 115-12 of the Code. See *id.* ¶ 42. Since Devale's statements were admissible under section 115-12, Uhls's testimony about the same statements was also properly admissible. See *id.*

¶ 65    The defendant argues in his reply brief that section 115-12 of the Code does not apply here because Devale did not identify the defendant in the Facebook photographs until two days after the shooting. He further argues that Devale's statement to Detective Uhls regarding the identification from the Facebook photographs was made before "perceiving" the defendant in a formal identification procedure. He contends that the Code requires the statement of identification to be made "after perceiving him." Accordingly, the defendant argues that the statements must be made proximate in time to the declarant perceiving the suspect, and because they were not, section 115-12 is inapplicable. We disagree.

¶ 66    The defendant in *People v. Thompson*, 2016 IL App (1st) 133648, made these exact arguments. There, the defendant argued that section 115-12 of the Code did not apply because the witness did not identify the perpetrator until a few days after the shooting. *Id.* ¶ 41. In disposing of that argument, the reviewing court held that section 115-12 "does not require immediate identification, and we will not read into the statute any provision that the plain language of that statute does not contain." *Id.* The *Thompson* court further held that section 115-12 does not require the statement to be made "after 'perceiving' [the shooter] in any formal identification procedure, such as a lineup." *Id.* For these reasons, we reject the defendant's arguments in the instant case regarding the timing of Devale's statements.

- 14 -

¶ 67    The defendant further argues that section 115-12 does not apply because Devale's identification of the defendant to Detective Uhls included more than mere identification but also included a description of the defendant's clothes and the indication that he was holding a gun. Again, we disagree. Section 115-12 has been interpreted "to include any 'identification evidence,' including a witness's statements to police describing the offender." *Id.*; see also *Temple*, 2014 IL App (1st) 111653, ¶ 41 (witnesses' description of defendant is considered steps in identification process and admissible as statements of identification). We reject the defendant's arguments to the contrary. Because we conclude that the identification testimony was properly admissible, there is no clear or obvious error. Accordingly, there can be no plain error. See *Piatkowski*, 225 Ill. 2d at 565.

¶ 68    However, even assuming, *arguendo*, that the testimony was inadmissible, it would still not rise to the level of plain error. As noted, the defendant requests us to review this issue under the closely balanced prong of the plain-error rule. He contends that the evidence is closely balanced here for the reasons set forth in the foregoing issue. We disagree. As discussed in the foregoing issue, even omitting any testimony regarding the Facebook photographs, there is ample additional evidence in the record to support the defendant's conviction. Both Devale and Kiwan identified the defendant in the photographic lineups presented by the detectives. Kiwan denied looking at any photographs on Facebook. Moreover, Devale testified that he recognized the defendant in the lineups because he stood close enough to see the face of the man who shot him on the night in question. Devale also identified the defendant in open court.

¶ 69    For the foregoing reasons, we cannot conclude that the evidence was so closely balanced that the guilty verdict may have resulted from the alleged error and not the evidence. See *Herron*, 215 Ill. 2d at 178. Accordingly, this issue does not merit review under the closely balanced prong of the plain-error rule, and we deny the defendant's request to review it on this basis.

¶ 70    In the alternative, the defendant argues that his counsel was ineffective for failing to object to the State's elicitation of the prior consistent statement. To reiterate, in order to succeed on an ineffective assistance of counsel claim, the defendant must show that trial counsel's representation fell below an objective standard of reasonableness and that the defendant was prejudiced by counsel's substandard performance. *Strickland*, 466 U.S. at 687. To show prejudice, the defendant must establish a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different. *Id.* at 694.

¶ 71    Here, the defendant cannot show that he received ineffective assistance of counsel because we concluded that the testimony about the prior consistent statements of identification was not improper. Defense counsel cannot be ineffective for failure to object to properly admitted evidence. Not objecting does not show a deficient performance by counsel. To the contrary, not objecting establishes that counsel was aware of the established law that a witness who testifies at trial and is subject to being cross-examined is allowed to testify regarding statements of identification. See *Temple*, 2014 IL App (1st) 111653, ¶ 54; see also 725 ILCS 5/115-12 (West 2016). Accordingly, the first prong of *Strickland* is not satisfied. 466 U.S. at 687.

¶ 72    Moreover, the defendant failed to satisfy the second prong of *Strickland*, as he failed to show the requisite prejudice. See *id.* at 687, 694. As observed in the discussion of the previous issue, even without the testimony regarding the Facebook photographs, there is ample additional evidence to support the defendant's conviction. Devale and Kiwan both identified the defendant in the photographic lineups. Kiwan denied seeing any photographs on Facebook.

- 15 -

Devale testified that he recognized the defendant in the lineups because he stood close enough to see the face of the man who shot him on the night in question. Devale also identified the defendant in open court.

¶ 73 We conclude that, even if defense counsel had objected to the identification testimony, the outcome of the trial would not have been different. Accordingly, the defendant has failed to establish prejudice under *Strickland* and his ineffective assistance of counsel claim fails.

¶ 74 CONCLUSION

¶ 75 For the foregoing reasons, we affirm the defendant's conviction.

¶ 76 Affirmed.