2021 IL App (1st) 191420-U

THIRD DIVISION
June 23, 2021

No. 1-19-1420

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| TIERRA MEEKS, Special Administrator of the Estate Of Elaine Jones, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 15 L 11535 |
| | ) | |
| VINODINEE DISSANAYAKE, M.D.; ELISABETH SCHREIBER, RN; and MARK E. JASPER, APN, | ) ) ) | Honorable Elizabeth Budzinski, |
| Defendants-Appellees. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices Ellis and Burke concurred in the judgment.

ORDER

¶ 1     *Held*:   The judgment of the circuit court of Cook County is affirmed in part and reversed in part. The trial court erred when it barred plaintiff's expert from testifying about the delay in the patient's treatment and whether such delay was a proximate cause of the decedent's death. The resulting directed verdict in favor of the nurse defendants on the basis that there was no evidence to create a question of fact on the issue of proximate cause is reversed. The jury verdict in favor of the defendant doctor stands.

¶ 2     Plaintiff brought this wrongful death medical malpractice action against the deceased patient's treating physician and nurses following the patient's death from septic shock.  At the jury trial, the trial court barred plaintiff's controlled expert witness physician from testifying that the defendant nurses deviated from the standard of care and proximately caused the patient's death. The court barred the testimony on the basis that those opinions had not been disclosed

prior to trial in accordance with Illinois Supreme Court Rule 213. Having barred plaintiff's sole causation expert relative to defendant nurses, the trial court entered a directed verdict in the nurses' favor. The claims against the doctor went to the jury. The jury rendered a verdict of no liability for the defendant physician.

¶ 3    Plaintiff appeals arguing that the trial court erred in (1) barring plaintiff's controlled expert physician's causation opinions relative to defendant nurses; (2) barring plaintiff's controlled expert physician from testifying that defendant nurses deviated from the standard of care; and (3) granting a directed verdict in favor of defendant nurses. Defendant also requests that, in the event a new trial is granted with respect to defendant nurses, the jury verdict for defendant doctor should be reversed so that the doctor can be included as a defendant in the new trial.

¶ 4    For the following reasons, the judgment of the circuit court of Cook County is affirmed in part and reversed in part and the case is remanded for further proceedings.

¶ 5                                    BACKGROUND

¶ 6    Plaintiff, Tierra Meeks, special administrator of the Estate of decedent patient, Elaine Jones, filed this wrongful death medical malpractice action against Elisabeth Schreiber and Mark Jasper (collectively "defendant nurses") and Dr. Vinodinee Dissanayake (Dr. Dissanayake) related to care provided to Jones in the emergency department at the University of Illinois Chicago Hospital (UIC) prior to her death.

¶ 7                           Elaine Jones' Treatment at UIC

¶ 8    A general timeline of Jones' treatment at UIC follows. Between 5 p.m. and 6 p.m. on November 22, 2013, Jones was working as an employee registrar at UIC when she walked over to the triage desk and reported to the triage nurse, defendant Schreiber, that she had not been

feeling well. Jones was alert, oriented, and talking normally. Schreiber performed a nursing triage assessment of Jones in Triage Room 1.

¶ 9                                    Jones' Triage Assessment

¶ 10    The triage process involves a "brief nursing assessment" including the patient's chief complaint, vital signs, medical history, and medications and interventions pertaining to the patient's chief complaint or which are necessary to determine the right triage category. The triage category is a number 1 through 5 on the Emergency Severity Index (ESI) that is assigned to a patient with 1 being the most serious—the patient has life-threatening issues requiring immediate attention—and 5 being the least serious—the patient has a minor issue or ailment and would typically be seen in the "fast track area." The "fast track area" is an area within the emergency department staffed by an advanced practice nurse.

¶ 11    Schreiber, after completing her assessment, noted Jones had an elevated respiratory rate of 22 where 20 is considered normal range, normal blood pressure, a normal heart rate, and a low-grade fever of 100.6 degrees Fahrenheit. Schreiber accessed Jones' electronic medical record at UIC which showed Jones' most recent visit to the emergency room and that she suffered from diabetes and idiopathic thrombocytopenia purpura (ITP)—a condition which affects the blood's ability to clot.

¶ 12    Schreiber learned from Jones that she was taking Metformin for her diabetes. Schreiber did not ask if Jones had any prior surgery—which she did, a splenectomy. Schreiber did not ask Jones if she was taking steroids—which she was. Schreiber gave Jones Tylenol and juice because Jones' blood sugar was on the lower side of normal.

¶ 13    Based on her triage assessment, Schreiber categorized Jones as an ESI 3. This meant Jones needed attention in the emergency department and would require two or more resources

which could include intravenous administration of fluids or medicine, blood testing, and electrocardiogram (EKG) and/or radiology studies.

¶ 14    Systematic Inflammatory Response (SIRS) is a broad syndrome identified by a group of four measurements including elevated heart rate, respiratory rate, temperature, and white blood count. These measurements, referred to as the SIRS criteria, allow healthcare providers to identify if a patient is at risk of developing a worsening infection. Three out of the four measurements were ascertainable at triage. Jones had two of the three SIRS criteria at triage. Jones' measurements on the SIRS criteria would raise suspicion of sepsis.

¶ 15    At 5:28 p.m. an EKG was performed on Jones which did not show an acute coronary event.

¶ 16    After Schreiber's initial triage, Jones was seen in Triage 2, where a second EKG was taken, blood was drawn, and labs were taken, after which Jones was returned to the triage waiting area. At 6:50 p.m., Schreiber saw Jones in the waiting room and took another set of vitals. Jones' respirations were within the normal range and she was alert and oriented. Thereafter Jones was moved out of triage, and Schreiber provided no further care to Jones.

¶ 17                        Jones' Care in the Emergency Department

¶ 18    Upon leaving triage, Jones was transferred to a bed in the back hallway of the emergency department, which is done when there are no other available beds.

¶ 19    At around 7:00 p.m., Dr. Dissanayake was handed Jones' second EKG for assessment. The EKG showed Jones' heart rate was 108 beats per minute. Dr. Dissanayake went to see Jones and did a cursory physical exam. Jones was talkative and appeared stable to Dr. Dissanayake. Jones said that she was experiencing chest pressure. Jones had been having malaise, fever, and chills. Dr. Dissanayake asked Jones for additional history including her medical and surgical

history. Jones responded that she had ITP and diabetes. Dr. Dissanayake asked Jones for her medications and Jones told her she was taking Metformin. Around 7:11 p.m., Dr. Dissanayake reviewed Jones' vitals, labs, and any notes made related to Jones. Dr. Dissanayake acknowledged that, had she known Jones did not have a spleen, she would have been more acutely aware of the need to really evaluate the fever and chest pain. But Dr. Dissanayake stated that it would not have changed what she did.

¶ 20    Defendant Jasper, a nurse practitioner, was working in the fast-track section of UIC's emergency department the night of Jones' visit. The fast-track area is reserved for lower acuity patients with an ESI 4 or 5. Jasper first encountered Jones while she was in the hallway bed at approximately 8:24 p.m., having recognized her as a co-worker. Jasper was not assigned to Jones nor was he involved in orders placed under his name prior to that time, including the IV capped catheter placed on Jones' arm, blood work, and a urinalysis. Upon seeing Jasper, Jones told him she felt cold. Jasper performed a quick physical of Jones in the hallway and listened to her heart and lungs. Jasper noted Jones was tachycardic—meaning Jones had an elevated heart rate—when he listened to her lungs. Jones' heart rate was only up a little bit. Jasper pushed on her stomach but did not lift her shirt or take her pants off because she was in the hallway in plain view of others. Jones was alert, orientated, and had no acute distress.

¶ 21    Jasper brought Jones to a bed in fast-track. He asked Jones about her medical history and she told him she recently started taking Metformin. He asked her if she was diabetic. Jasper placed Jones on a monitor and saw that her heart rate was elevated and that she had a fever but had no other abnormal vitals. While Jasper was attending to other patients, another nurse, Donna Entrekin, notified him that Jones was complaining of mid-sternal chest and abdominal pain. Around 8:37 p.m. Jasper entered an order for pain and nausea medication, a flu swab, additional

fluids, and an EKG. Jasper administered the pain medication through an IV with fluids that had been started when he brought Jones into fast-track. At 8:45 p.m. the results of an EKG Jasper ordered were returned abnormal.

¶ 22    Between 8:45 p.m. and 8:55 p.m., Jasper was notified by Entrekin that Jones' mental status had changed—she had begun slurring her words and was slow to respond. Jasper had intended to perform a full head to-toe examination of Jones but when she became acutely ill, he prioritized her care and got Dr. Dissanayake involved just before 9:00 p.m. Jasper shared the information he had about Jones' condition. When Dr. Dissanayake saw Jones, she was moaning and not responding to questions. She listened to Jones' lungs and heart.

¶ 23    At 8:55 p.m. an order was entered for a computed tomography (CT) scan of Jones' brain which Jasper and Dr. Dissanayake discussed because the doctor was concerned about a bleed, meningococcemia, or meningitis. At 8:59 p.m. there was an order for IV fluids. At around 9:00 p.m., Dr. Dissanayake gave a verbal order for antibiotics and additional fluids to be started which she wanted administered right away before the patient went to CT. At 9:03 p.m. a blood culture was completed. Between 9:03 p.m. and 9:07 p.m. Jones was taken out of the fast-track area and brought to a room, after which Jasper provided no further care for Jones as he remained in fast-track.

¶ 24    By 9:50 p.m. Jones had returned from the CT scan. Dr. Dissanayake went to Jones' room at 10:00 p.m. Jones was placed on a monitor. At 10:18 p.m. the antibiotics that Dr. Dissanayake ordered were administered. Dr. Dissanayake was frustrated by the delay in administering the antibiotics to Jones. Dr. Dissanayake thought Jones looked improved since the last time she saw her.

¶ 25    Shortly thereafter, Jones' heart rate went from the 90s to the 160s within seconds and her blood pressure had dropped.  Jones became agitated, stated she could not breathe, and tried to pull out her IVs.  At 10:40 p.m., Jones was moved to another room where she was intubated. Jones lost her pulse.  CPR was attempted but unsuccessful.  Jones was pronounced dead at 12:50 a.m. on November 23, 2013.

¶ 26                                    Trial Testimony

¶ 27    Plaintiff retained three experts who testified at trial: (1) nurse practitioner Kristen Harris who testified to the standard of care applicable to Jasper and his alleged deviations therefrom; (2) nurse Scott DeBoer who testified to the standard of care applicable to Schreiber and her alleged deviations therefrom; and (3) medical doctor Steven Gabaeff who testified to the standard of care applicable to Dr. Dissanayake, her alleged deviations therefrom, and that these deviations by Dr. Dissanayake proximately caused Jones' death.

¶ 28                     R.N. Scott DeBoer's Expert Witness Testimony

¶ 29    Registered nurse Scott DeBoer testified as plaintiff's controlled expert.  DeBoer was the only expert to testify at trial about Schreiber's alleged deviation from the standard of care. DeBoer testified that Schreiber deviated from the standard of care by (1) not obtaining a complete medical and surgical history from Jones; and (2) based on that failure, did not assign Jones a level 2 ESI categorization at triage and instead assigned her a level 3 ESI.

¶ 30    DeBoer explained that obtaining a complete medical and surgical history involved asking Jones whether she had any major surgeries in the past because it would be necessary to know if Jones had a splenectomy. DeBoer testified that it would also be necessary to ask Jones what medications she was taking.  DeBoer explained that Jones was taking a high dose of steroids which was important to know because steroids make it hard to fight infection.

¶ 31    DeBoer acknowledged, however, that Schreiber did ask Jones about her medical history, but that Jones failed to advise Schreiber that she did not have a spleen and was taking steroids. DeBoer further testified that "if a patient with all of the other characteristics of Elaine Jones walked into an emergency department without a splenectomy and without a history of steroids, that patient would have been appropriately categorized as an ESI-3."

¶ 32              Nurse Kristen Harris, R.N.'s Expert Opinion Witness Testimony

¶ 33    At trial, family nurse practitioner Kristen Harris testified as plaintiff's controlled expert witness.  Harris was the only expert to testify at trial about Jasper's alleged deviation from the standard of care.  Harris testified that Jasper deviated from the standard of care when he (1) failed to take an adequate history from Jones, *i.e.* when he provided medications and provided an ineffective report to the attending physician upon transferring Jones from a hallway bed to the fast-track department; (2) failed to timely transfer Jones' care to an attending physician which should have occurred when he took Jones back to fast-track; and (3) failed to timely order IV fluids and antibiotics, obtain additional laboratory and physical examinations including blood pressure, heart rate, respiratory rate, oxygen saturation, and temperature.

¶ 34    Harris elaborated:

> "A thorough history would have revealed the severity of [Jones'] symptoms as well as viewing the medical records such as vital signs and laboratory data as well as past medical history which was extremely significant in this situation, because it placed her at very high risk due to her symptoms since she was a diabetic, she had had her spleen removed, she had a condition that was called ITP which affected her ability to clot, and she had prior records that were available for a

provider to view and that was not apparently considered when he assumed care and placed orders."

Harris indicated it was not clear whether a physical examination was conducted, noting that one was documented in Jones' records but it stated an "assessment of her abdomen did not reveal any scars which would have easily been seen if the patient would have not had their clothes on and would have had an appropriate gown to facilitate a thorough physical examination." Harris explained:

"I think that if the attending emergency room physician would have had awareness of the complete picture of the vital signs, of the labs that had been taken, if an adequate history had been done by the nurse practitioner, then perhaps valuable time getting a CT would not have occurred and her sepsis could have been treated sooner."

Harris acknowledged that antibiotics were ordered at 9:00 p.m. by Dr. Dissanayake within an hour of Jasper's first involvement with Jones.

¶ 35 Barring of Dr. Gabaeff's Testimony About Jasper and Schreiber

¶ 36 Dr. Gabaeff was called by plaintiff and testified to Dr. Dissanayake's standard of care deviations and his opinion that these deviations proximately caused Jones' death. Dr. Gabaeff's trial testimony did not include causation opinions relative to the nurse defendants.

¶ 37 The day after Dr. Gabaeff's testimony was concluded, plaintiff made an oral motion to recall Dr. Gabaeff to the stand to ask whether he had an opinion whether the deviations in the standard of care by Schreiber and Jasper, including the failure to get an adequate history, proximately caused a delay in treatment or injury to Ms. Jones. Initially, defendants objected based on prejudice and the trial court ruled that Dr. Gabaeff would be allowed to testify that

"Nurse Schreiber and Nurse Jasper *** their failure to get the adequate history and know about these issues caused or contributed to the death."

¶ 38    However, prior to Dr. Gabaeff taking the stand for the second time, defendants raised a second objection arguing that Dr. Gabaeff should be barred from testifying to causation relative to Schreiber and Jasper because these opinions had not been properly disclosed pursuant to Supreme Court Rule 213.

¶ 39            Decision to Bar Dr. Gabaeff's Opinions Relative to Defendant Nurses

¶ 40    The trial court barred Dr. Gabaeff from testifying as to the standard of care relative to both Schreiber and Jasper, citing Illinois caselaw which prevents a physician from testifying as to a nurse's standard of care and deviations therefrom.  During argument on plaintiff's motion to recall Dr. Gabaeff, plaintiff pointed to Dr. Dissanayake's trial testimony in which she stated that it would be important for her to know whether Jones had a spleen or not, but further stated that this knowledge would not have changed the course of her treatment.  The trial court responded stating,

> "So [Dr. Dissanayake] doesn't even provide causation because [] she said if they
> had known about the spleen, of course I would have done something differently
> 'but I didn't know it, so that's why I did that.'  She doesn't give that."

¶ 41    Following argument on defendants' objection to portions of Dr. Gabaeff's testimony, the trial court concluded that Dr. Gabaeff could not provide opinion testimony of causation relative to defendant nurses because (1) there was nothing linking what Dr. Gabaeff proposed to testify about regarding the nurses' deviations from the standard of care with the deviations testified about by nurses Harris and DeBoer; and (2) Dr. Gabaeff's opinion as to the nurses' deviations from the standard of care were not previously disclosed.  The trial court ruled the causation

opinions relative to the nurse defendants that plaintiff sought to elicit upon recalling Dr. Gabaeff were new opinions, were not logical corollaries of his previously disclosed opinions, and thus were impermissible.

¶ 42    The trial court stated that the basis for its ruling was Dr. Gabaeff's failure to link his opinions to the deviations testified to by plaintiff's nursing experts. The trial court explained that Dr. Gabaeff's opinions had to be disclosed prior to trial, which it concluded did not occur here because the deviations from the standard of care testified about by the nurse experts were not the same as the deviations on which Dr. Gabaeff's opinions as to proximate cause were based. The trial court found that Dr. Gabaeff sought to provide his opinion as to the nurses' conduct being a proximate cause in this case based on trial testimony rather than his own previously disclosed opinions. Specifically, the trial court found that Dr. Gabaeff's opinion as to proximate cause for the nurses' actions would include support from the opinions offered by Harris and DeBoer as to the nurses' deviations from the standard of care. The trial court concluded that an opinion by Dr. Gabaeff based upon the trial testimony would be a new opinion, presented impermissibly for the first time at trial. Based on the trial court's ruling, Dr. Gabaeff was not recalled to testify and plaintiff's case-in-chief was concluded.

¶ 43                    Directed Verdict and Posttrial Motion

¶ 44    At the close of plaintiff's case, the trial court granted defendant nurses' request for a directed verdict in their favor on the grounds that plaintiff failed to present proximate cause evidence relative to defendant nurses. Thereafter, Dr. Dissanayake put on her case and the jury found in her favor. The trial court entered judgment on the jury's verdict.

¶ 45    Plaintiff filed a posttrial motion requesting a new trial. In her motion, plaintiff pointed to various alleged errors by the trial court, including an argument that the trial court erred when it

barred Dr. Gabaeff from testifying about whether defendant nurses' negligence was a proximate cause of death. Plaintiff did not argue in her posttrial motion that the jury's verdict against Dr. Dissanayake is against the manifest weight of the evidence. However, in her reply to defendants' response to the motion for new trial, plaintiff argued that the jury could not properly consider Dr. Dissanayake's fault once the directed verdict was entered against defendant nurses, reasoning that "it was the nurses who failed to properly advise Dr. Dissanayake of Ms. Jones' true condition" so "[t]he jury had to figure that if the nurses did nothing wrong, then the doctor couldn't have done anything wrong either."

¶ 46    The trial court denied plaintiff's posttrial motion, and this appeal followed.

¶ 47                                ANALYSIS

¶ 48    On appeal, plaintiff argues the trial court erred in (1) barring Dr. Gabaeff from testifying that defendant nurses deviated from the standard of care; (2) barring Dr. Gabaeff from testifying the defendant nurses' negligence was a proximate cause of decedent's death; and (3) granting a directed verdict in favor of defendant nurses. Plaintiff also argues that, in the event a new trial is granted as to defendant nurses, Dr. Dissanayake should also be a defendant in that new trial.

¶ 49    A trial court's evidentiary rulings, including its decisions on whether to admit expert testimony, are reviewed for an abuse of discretion. *Davis v. Kraff*, 405 Ill. App. 3d 20, 28 (2010). "Faced with a challenge that testimony was not disclosed or exceeds the scope of Rule 213 disclosure, a trial court's ruling on the admission of evidence is an exercise of its discretion and will not be reversed absent an abuse of that discretion." *Steele v. Provena Hospitals*, 2013 IL App (3d) 110374, ¶ 93, citing *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109 (2004). An abuse of discretion occurs when the trial court applies the wrong legal standard or used the wrong legal criteria. *Shulte v. Flowers*, 2013 IL App (4th) 120132, ¶ 23. A trial court's decision

to enter a directed verdict is a question of law which we review *de novo*. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 112 (2004).

¶ 50     On appeal, plaintiff first argues that the trial court abused its discretion when it denied plaintiff's request to recall Dr. Gabaeff to testify that defendant nurses' negligence was a proximate cause of decedent's death because plaintiff properly disclosed this opinion by Dr. Gabaeff in discovery. Plaintiff argues defendants "were on notice of Dr. Gabaeff's opinion" that "all of the defendants' negligence proximately caused" the death, including the nurse defendants. Plaintiff in part argues this opinion was disclosed when defendants questioned Dr. Gabaeff about his notes at his deposition where his notes were an exhibit to his deposition. Plaintiff argues that after discovery the "thrust of this case was clear *** defendant nurses failed to take a complete history and examination and communicate that history to the attending doctor;" and that had they done so and not deviated from the standard of care, "an attending physician acting within the standard of care, would have given [decedent] fluids and antibiotics and she most likely would have recovered."

¶ 51     In support of this conclusion, plaintiff relies on the following disclosures made during discovery:

> 1.      Plaintiff's Rule 213 answers to interrogatories stated "The hospital mis-
> triage, the failure to be seen in a timely manner, the NP [(nurse practitioner)]
> inability to recognize and communicate, effectively with the provider and the
> provider's ill informed and poor decision making at the critical moments,
> constitutes gross negligence in failing to meet the standard of care in this critical
> life threatening situation."

2.    Plaintiff's Rule 213 answers to interrogatories stated the nurse practitioner placed decedent in the hall without having examined her and "not fully aware of the history which was clear for infection and sepsis, prior to full shock setting in."

3.    Dr. Gabaeff's notes stated the triage nurse did not perform a proper medical screening.

4.    Dr. Gabaeff's notes stated the emergency department at UIC failed to elicit decedent's history of a splenectomy or her dosage of prednisone therapy.

5.    The nurses failed to review decedent's primary care clinic record.

6.    The triage nurse failed to learn of the splenectomy.

¶ 52    Defendants respond that plaintiff failed to properly disclose Dr. Gabaeff's proposed testimony pursuant to Rule 213. Defendants reason that the trial court properly found that "the causation opinions that Plaintiff sought to elicit from Dr. Gabaeff were not previously linked to the criticisms testified to by Nurses DeBoer and Harris that [defendant nurses] failed to obtain a history of splenectomy and steroids." Defendants assert the information disclosed in plaintiff's Rule 213 answers to interrogatories and Dr. Gabaeff's report speak only to negligence and not proximate cause; and Dr. Gabaeff's notes "were neither part of his Rule 213 disclosure nor discussed in detail in his deposition testimony." Defendants also maintain that Dr. Gabaeff's notes do not contain an opinion that "any deviation identified by Nurse DeBoer or Nurse Harris proximately caused injury" to decedent.

¶ 53    In response to plaintiff's specific allegedly qualifying disclosures, defendants state:

1.    Dr. Gabaeff's statement defendant Jasper placed decedent in the hallway without getting an appropriate history and recognizing sepsis is a statement about conduct (*i.e.* deviation from the standard of care) and not causation; Dr. Gabaeff

is not qualified to offer an expert opinion as to whether Jasper's conduct fell below the standard of care; and, regardless, Dr. Gabaeff disavowed any commentary on Jasper's deviation from the standard of care.

2.      Dr. Gabaeff was not aware of Nurse Harris's opinions regarding defendant Jasper's deviations from the standard of care—Nurse Harris being plaintiff's standard of care expert as to defendant Jasper—nor did plaintiff disclose Dr. Gabaeff's opinion as to how defendant Jasper's conduct proximately caused the death; thus, "the trial court correctly concluded that any opinion *** about how the alleged deviations by [defendant] Jasper as testified to by Nurse Harris caused injury would violate Rule 213.

3.      Although plaintiff did disclose Dr. Gabaeff's opinion as to how defendant Schreiber's conduct proximately caused the death, being specifically that "a well-trained provider would have recognized[decedent] as a [ESI] category 1 immediately based on a complete history and her presenting symptoms," the conduct on which Dr. Gabaeff relied was not the deviation from the standard of care that Harris testified about at trial that, had defendant Schreiber learned decedent's history of steroid use and splenectomy, the appropriate ESI was 2; "[n]or did Dr. Gabaeff testify at trial that had [decedent] been categorized an ESI 2 or had the history of splenectomy and steroid use been communicated to a reasonably careful physician *** that would have resulted in a *** better outcome."

4.      "Dr. Gabaeff never properly disclosed any opinion as to how a more complete history revealing

    a.  a splenectomy

    b.  splenectomy scar or

    c.  steroid use

would have impacted a reasonably careful physician's treatment of [decedent.]"

    5.    Plaintiff's counsel did not "remedy any defects regarding causation"

    during Dr. Gabaeff's deposition.

¶ 54    In reply, plaintiff argues (1) Dr. Gabaeff did not review Nurse Harris' testimony and (2) Dr. Gabaeff's statement that he was not offering an opinion as to whether defendant Jasper's conduct was a deviation from the standard of care has "no bearing on whether [Dr. Gabaeff] could give causation opinions" as to defendant Jasper (or defendant Schreiber). This is because, according to plaintiff, under *Northern Trust Co. v. University of Chicago Hospitals and Clinics*, 355 Ill. App. 3d 230, 242 (2004), Dr. Gabaeff was the only witness qualified to give an expert opinion as to whether the defendant nurses' negligence was a proximate cause of the death. Furthermore, plaintiff argues that Dr. Gabaeff's failure to review Nurse Harris's testimony is not dispositive because Dr. Gabaeff's review of decedent's medical records provided "a proper basis for [Dr. Gabaeff's] causation opinions regarding [defendant] Jasper's conduct." Further, Dr. Gabaeff could form an opinion as to whether defendant Jasper's conduct was a proximate cause of death from reviewing decedent's medical records. As for defendant Schreiber, plaintiff argues that Dr. Gabaeff's opinion is based on the same conclusion stated by Nurse DeBoer: that defendant Schreiber mistriaged decedent because defendant Schreiber did not obtain a complete medical and surgical history.

¶ 55    Plaintiff also claims that Dr. Gabaeff's causation opinion was included in his report provided in discovery and, at the very least, his opinion is a logical corollary to his opinions in his report.  Plaintiff specifically relies on the following statements in Dr. Gabaeff's report:

1.  "Decedent's demise started when she was mis-triaged on arrival a resultant catastrophic effect

2.  Using a conventional triage scale *** [decedent] was mischaracterized as a Triage category 3; a mistake that was most responsible for her death [(emphasis in original)].

3.  Her correct triage category was at least 2 at first and 1 within a short time.  In my opinion, a well-trained provider would have recognized her as a category 1 immediately based on a complete history and her presenting symptoms and in need of immediate treatment ***."

The conclusion to Dr. Gabaeff's report reads, in pertinent part, as follows:

"Ms. Jones if treated in a timely manner would have had a > 50% chance of being alive today.  Mistriage followed by inattention to her rapidly changing status, and a failure to follow the hospital's own guidelines, kept her from the immediate basic care she needed in the timely manner, which is the standard of care for sepsis.  The course of events validated the worth of the principle of timely aggressive care with large amounts of IV fluids (fluid resuscitation) and large doses of strong, well accepted antibiotics that should be used to treat sepsis.  Poor decision making, mid-stream, based on lack of attention to details that were available and inadequate early involvement of a capable physician provider, lead to a state of inevitable death that was not present when she arrived in the ED 7

hours before her death. The hospital mis-triage, the failure to be seen in a timely manner, *the NP inability to recognize and communicate, effectively with the provider* and the providers *ill-informed* and poor decision making at the critical moments, constitutes gross negligence in failing to meet the standard of care in this life threatening situation." (Emphases added.)

¶ 56 Plaintiff contends that Dr. Gabaeff's notes state his opinions regarding defendant nurse's conduct and that these "opinions were the foundation of Dr. Gabaeff's opinions [regarding causation,] which were also supplied at the doctor's deposition."

¶ 57 At the hearing the court held regarding whether to allow plaintiff to recall Dr. Gabaeff to testify concerning his opinion as to whether defendant nurses' conduct was a proximate cause of the death, the parties began with discussing Dr. Gabaeff's report and the conclusions stated therein. Defendants' attorney acknowledged that during his deposition, with regard to "all of the opinions" in his report, it was Dr. Gabaeff's opinion that "the deviations from the standard of care proximately caused the death." Defendants' attorney complained that the deviations Dr. Gabaeff discussed during the deposition, however, concerned only Nurse Schreiber and Dr. Dissanayake, not Nurse Jasper and, for that reason, anything Dr. Gabaeff would testify about concerning whether "anything Jasper did or didn't do caused or contributed to any injury or damage *** is outside the bounds of Rule 213." Plaintiff's attorney pointed out that Dr. Gabaeff's report stated "the deviations from the standard of care by all three [defendants] proximately caused her death;" and the trial court agreed that in paragraph 53 of the report Dr. Gabaeff wrote that the deviation as to defendant Jasper was that Jasper "did not take a full history. It was mistakenly assigned, and obviously he didn't have enough information to

communicate to Dr. [Dissanayake.]" The trial court also agreed that Dr. Gabaeff "said in his deposition that the items in his report proximately caused the death."

¶ 58    However, plaintiff's counsel then informed the trial court how she planned to proceed if allowed to recall Dr Gabaeff to testify. Plaintiff's counsel represented to the court that she would read or summarize expert witness Nurse Harris's testimony to Dr. Gabaeff, then ask Dr. Gabaeff if the deviations Nurse Harris testified to, which were just read to him, were a proximate cause of the death. It was at that point defendants' attorney objected that "[t]o give him that question and to elicit an opinion based on that question is a new opinion." Defense counsel argued "[h]e can't do that. That's for the first time at trial an undisclosed opinion." The trial court agreed with defendants' counsel that Dr. Gabaeff would have to "stick to what it says in his deposition or report." The trial court noted that Dr. Gabaeff could not offer an opinion as to the nurses' deviations from the standard of care and stated: "he's acknowledged what the deviations were in his report, and those are the only ones he can link up; otherwise it's a new opinion." Defendants' attorney argued that "all that's in that report is an issue of communication" between Jasper and Dr. Dissanayake. The court responded that, given the court's ruling, "there is only one criticism" Dr. Gabaeff could offer a causation opinion about—that Jasper "didn't communicate [decedent's history to Dr. Dissanayake] because [Jasper] didn't know it;" or in other words defendant Jasper "failed to *** acquire a complete history of [decedent] and communicate that to Dr. Dissanayake."

¶ 59    Turning to defendant Schreiber, defendants' attorney argued that the basis for Dr. Gabaeff's opinion that defendant Schreiber's conduct was a proximate cause of the death was "her failure to recognize the signs and symptoms of SIRS and sepsis in triage [which "should have led to an ESI-2."]." Defendants argued that because the standard of care expert, DeBoer,

did not opine that same failure was a deviation from the standard of care, the proffered opinion from Dr. Gabaeff regarding defendant Schreiber was either a new opinion or a new basis for his opinion. Defendants admitted that the basis for Dr. Gabaeff's opinion as to defendant Schreiber was her failure to obtain a "complete history" of decedent, but defendants argued Dr. Gabaeff never before disclosed that he meant obtaining a "complete history" included learning that the decedent had previously had a splenectomy and was taking steroids. The trial court recognized that this dispute raised the question of whether "complete history" is "sufficient notice of what he's saying" for purposes of Rule 213. The court found that Dr. Gabaeff did not state that a "complete history" would have included finding out that the decedent had a splenectomy or was on steroids either in his report or in his deposition and that plaintiff's attorney could point to no such language. Plaintiff's counsel responded by stating that in her reexamination of Dr. Gabaeff she would only ask Dr. Gabaeff about his opinions based on defendant Schreiber's failure to obtain a "complete history" (apparently without asking him to explain what that means) and her mistriage of decedent.

¶ 60    Following a recess, the trial court returned to the question regarding defendant Jasper. The trial court noted its belief that the two deviations from the standard of care on which Dr. Gabaeff based his proximate cause opinion as to Jasper were in paragraph 53 of his report but that Dr. Gabaeff "took that back." Plaintiff disagreed with the trial court's characterization of Dr. Gabaeff's deposition testimony as rescinding the bases for his opinion that defendant Jasper's conduct was a proximate cause of death. Plaintiff argued, in part, that Dr. Gabaeff was "basing his causation opinion on the facts of what happened in the case." The trial court ruled that the "standard of care has to come through Harris and DeBoer" to provide the basis for Dr. Gabaeff's opinion that a deviation from the standard of care was a proximate cause of death and

that Dr. Gabaeff failed to say that obtaining a "complete history" from the decedent "would have discovered the splenectomy, the steroid use ***;" therefore, the court would not allow Dr. Gabaeff to "testify as to causation as to either Schreiber or Jasper." Plaintiff's counsel argued that Dr. Gabaeff disclosed prior to trial that the bases of his opinions were the failure to obtain a "complete history" and the mistriage of decedent. The trial court stated that, nonetheless, Dr. Gabaeff had to read a standard-of-care expert's report stating what "complete history" meant to be able to testify. Defendants' attorney informed the court and conceded that Dr. Gabaeff did read DeBoer's report and, in DeBoer's report, DeBoer stated that a complete history would have found out decedent had a splenectomy and was on steroids. The trial court then acknowledged that Dr. Gabaeff talked in his deposition about defendant Schreiber's failure to obtain a complete history. Further, DeBoer testified that Schreiber's mistriage "was the failure to get the history of splenectomy and steroid use."

¶ 61    Plaintiff argued that Rule 213 requires the expert to disclose the basis for his opinion, and that the opinion disclosed in this case is based on the mistriage that resulted from the failure to obtain a "complete history" which is "sufficient to put them on notice of what his theory is." Defendants countered that there is nothing in the disclosures or deposition "about anything other than the signs of SIRS in triage" and the mistriage as a category 3. The court acknowledged that the issue came down to whether saying "complete history" without elaboration was a sufficient disclosure under Rule 213. The trial court found it was not, and it also found that Dr. Gabaeff's notes were not disclosures under Rule 213. Defendants admitted that Dr. Gabaeff produced his notes at his deposition but argued the notes are not part of plaintiff's Rule 213 disclosure. The trial court stated that the notes are from Dr. Gabaeff's review of DeBoer's testimony but the trial court pointed out that Dr. Gabaeff did not state in his notes that he agreed with DeBoer. Plaintiff

argued the notes, which were disclosed at the deposition, explain what was missing from the "complete history." Plaintiff argued:

> "He says in the deposition that the items in my report were the proximate cause. In this report he says failure to take a complete history. In his supporting documents which everybody has, he writes specifically that she didn't know she didn't have a spleen and she didn't know that she was on Prednisone because she never asked. That's right here. So their claim that they didn't know is not true. It's right in the documents that they were given."

¶ 62 The trial court rejected plaintiff's argument and stood on its ruling denying plaintiff's request to recall Dr. Gabaeff to testify as to whether the nurse defendants' conduct was a proximate cause of the death in this case. The trial court reasoned that plaintiff's standard of care experts testified to deviations from the standard of care on which Dr. Gabaeff's opinions are not based and, because Dr. Gabaeff failed to disclose the basis of his opinion before trial, any such testimony would constitute a new opinion not previously disclosed.

¶ 63 For the following reasons, we hold that the trial court committed reversible error by finding that plaintiff's pretrial disclosures were not sufficient under Rule 213 or that Dr. Gabaeff failed to disclose the bases of his opinions as to proximate cause before trial. "One of the purposes of Rule 213 is to avoid surprise." *Sullivan*, 209 Ill. 2d at 109-10; *Steele*, 2013 IL App (3d) 110374, ¶ 92 ("The purpose of discovery rules, governing the 'timely disclosure of expert witnesses, their opinions, and the bases for those opinions[,] is to avoid surprise and to discourage strategic gamesmanship.' "). "An expert's testimony is limited to the *fair scope* of opinions disclosed during discovery." (Emphasis added); *Sinclair v. Berlin*, 325 Ill. App. 3d 458, 470 (2001), citing *Lucht v. Stage 2, Inc.*, 239 Ill. App. 3d 679, 692 (1992) ("An expert is not

limited to the exact words used in discovery, whether interrogatories or deposition, but to the 'fair scope' of the opinions disclosed." (construing former Illinois Supreme Court Rule 220(d) (134 Ill.2d R. 220(d)).

¶ 64    In *Spaetzel v. Dillon*, 393 Ill. App. 3d 806 (2009), this court addressed a plaintiff's argument that the trial court abused its discretion in allowing a doctor to testify as to his opinion interpreting certain radiographic films because allegedly that opinion "had not been disclosed in answers to interrogatories or in depositions and, therefore, the plaintiffs were prejudiced by such surprise." *Spaetzel*, 393 Ill. App. 3d at 812.  The evidence in that case was that the defendants' Rule 213 disclosures stated that the basis of the doctor's opinion included "all the relevant medical records and diagnostic studies." *Id.* at 813.  In his deposition, the doctor testified he had "reviewed X-rays from several periods of time." *Id.*  Nonetheless, the plaintiffs argued those disclosures did not put them on notice that defense counsel was going to display a blow up of a radiographic film and then elicit the doctor's opinion of those blown-up films or his opinion as to what a different film suggested about the condition that afflicted the plaintiff in that case. *Id.* This court disagreed. *Id.*  This court found that defendants had disclosed that the expert had reviewed the radiographic studies, disclosed the "general opinions" the doctor would testify to, and, specifically, disclosed that the doctor would testify what the second radiographic film suggested about the condition at issue. *Id.*  In reaching that conclusion, this court relied on both the doctor's answers to interrogatories and deposition testimony.  See *id.*  We held that the pretrial disclosures were sufficient and "the particular opinion *** regarding blown-up pictures of the CT scans, were permissible as an elaboration on, or logical corollary to, the originally revealed opinion." *Id.*

¶ 65    Later, relying on the decision in *Spaetzel*, this court addressed a plaintiffs' argument that the defense expert's pretrial disclosures "did not reveal the specific basis for their opinion, thus rendering their testimony violative of Rule 213." *Jones v. Beck*, 2014 IL App (1st) 131124, ¶ 17. This court disagreed, holding that based on a review of the record, the experts' opinions "were rather clearly disclosed." *Id.* at ¶ 18.  This court found in *Jones*, just as in *Spaetzel*, "the defendants disclosed the 'general opinions' that their defense expert would testify to during trial." *Id.*, citing *Spaetzel*, 393 Ill. App. 3d at 813.  The disclosure of the experts' "general opinions" was "sufficient to put the plaintiffs on notice regarding the details that emerged." *Id.* ¶ 18.

¶ 66    The *Jones* court separately addressed the plaintiffs' argument that the pretrial disclosures contain no mention that a certain action (in other words, the defendant's alleged deviation from the standard of care) would have prevented the injury (in other words, proximate cause). *Id.* ¶ 19.  We found that contention "meritless." *Id.*  Instead, we held that the "description of the anticipated trial testimony clearly put [the] plaintiffs on notice" that the experts would testify the alleged deviation was not a proximate cause of the injury. *Id.* ("the description of the anticipated testimony clearly put [the] plaintiffs on notice that Soden and Beck would testify to the inefficacy of the NG tube").  In that case, the pretrial disclosure was only that the experts were expected to testify that no deviation contributed to cause the injury. *Id.*  This court held, "[b]ased on these disclosed opinions," the "testimony regarding compliance with the standard of care [and] *** opinions regarding the absence of any proximate causation *** were all logical corollaries of the pretrial disclosures." *Id.*  In reaching this holding, we noted that Rule 213 "is intended to be a shield to prevent unfair surprise but not a sword to prevent the admission of

relevant evidence on the basis of technicalities. [Citations.]" (Internal quotation marks omitted.) *Id.* ¶ 18.

¶ 67    In *Foley v. Fletcher*, 361 Ill. App. 3d 39, 47 (2005), this court held that the expert's testimony did not violate Rule 213 where the testimony "did not advance a new theory of negligence or new reasons for his opinion." *Foley*, 361 Ill. App. 3d at 48. Later, in *Aguilar-Santos v. Briner,* 2017 IL App (1st) 153593, we rejected the defendant's argument that the plaintiff failed to disclose the expert's proximate cause testimony. We accepted that the expert's pretrial disclosures did not "specifically state" that the expert would provide the complained-of proximate cause opinion, but we held that "an expert's trial testimony does not necessarily violate Rule 213 if it is 'an elaboration on, or a logical corollary to, the originally revealed opinion.' [Citation.]" *Id*. at ¶ 50.

¶ 68    In this case, Dr. Gabaeff's disclosures were as follows:

> "(i) Subject(s)/Topic(s): Dr. Gabaeff will testify as to the facts and circumstances surrounding the treatment of the Decedent in the UIC ER on the night of the occurrence in question, based on his review of the pertinent medical records from the same; ***; and as to his opinion that the aforementioned deviations by this *and the other defendants* proximately caused the Decedent's death.
>
> (ii) Conclusions and Opinions: UIC Emergency Department professionals *** deviated from standard of care by one or more of the following: *mistriaged patient as a category 3* and assigned to 'fast track;' failure to treat in a timely manner; demonstration of inattention to patient's changing status; *failure to communicate within the Emergency Department* and to follow hospital guidelines.

Had the patient been treated in a timely manner she would have had a greater than 50% chance of surviving." (Emphases added.)

¶ 69    In his disclosed expert report, Dr. Gabaeff identified a list of events containing 58 items which he stated were below the standard of care and represented gross negligence. Relevant to defendant nurses were the following:

"1. Ms. Jones['][] demise started when she was *mis-triaged on arrival* a resultant catastrophic effect.

2. *** Ms. Jones was *mis-characterized as a Triage category 3*; a mistake that was most responsible for her death ***

6. Her correct triage category was at least 2 at first and 1 within a short time. In my opinion, a well-trained provider would have recognized her as a category 1 immediately based on a complete history and her presenting symptoms.

7. At triage she was designated triage category 3 ***

9. On closer exam of her med record at triage she already had fulfilled American College of Chest Physician's criteria for possible sepsis. This is referred to as the Systemic Inflammatory Response Syndrome (SIRS), with an elevated temperature and increased pulse.

10. Later workup, including blood drawn in triage, showed she fulfilled a third criteria, and in short order the 4th. ***

13. The condition she had (sepsis) is rapidly progressive and required ASAP intervention. This is a foundational principle in EM. Treatment is immediate high volumes of fluids (>2 liter or more in large people as AFAP; ~ over 30 minutes) to combat shock and 2 high dose strong antibiotics.

14. Delays of as little as few hours are the difference between life or death, as this case demonstrates. ***

20. Ms. Jones, in this case, remained [in] the hall for 3 hours, was not seen by any provider except a nurse that rechecked her temperature only at about [8:27 p.m.].

21. In triage she was given Tylenol to lower temp and it worked. Unfortunately, with Tylenol, any decrease in temp becomes an unreliable indicator of actual improvement in the underlying condition that can lead to a false sense of what is really happening.

22. During the 3 hours from 6p to 9p, the lack of proper attention by a physician violated the hospital own guidelines for triage 3 that dictates that the patient is to be seen by a physician (not an NP or an RN) in 30 minutes.

23. At around 9pm by accident (or luck), the PA assigned to her happened to walk by her in the hall and she stopped him, not knowing who he was, and reported she was cold (another finding in shock). He, laying eyes on her, seeing she was ill, brought her into a fast track room for the first time, 3 h after arrival[.]

* * *

29. At that time the patient was still awake but talking slower. The MD did not seem aware that the NP had ordered strong narcotic medications that were given at [8:40 p.m.] and [9:10 p.m.] Both these doses would make her sleepy (altered mental status) and can lower BP which would make things actually worse. ***

53. In a note written by the NP, it is stated that the MD, informed the patient was in the ED, told the NP to put the patient in the hall. He did this not having

examined her at all and apparently *not fully aware of the history* which was clear for infection and sepsis, prior to full shock setting in. \*\*\*." (Emphases added.)

¶ 70    The report's conclusions stated,

"Mistriage followed by inattention to her rapidly changing status, and a *failure to follow the hospital's own guidelines*, kept her from the immediate basic care she needed in the timely manner, which is the standard of care for sepsis. \*\*\* Poor decision making, mid-stream, based on *lack of attention to details that were available* \*\*\* lead to a state of inevitable death that was not present when she arrived in the ED 7 hours before her death. The hospital mis-triage, \*\*\*, *the NP inability to recognize and communicate, effectively with the provider* \*\*\*, constitutes gross negligence in failing to meet the standard of care in this life threatening situation." (Emphasis added).

¶ 71    Dr. Gabaeff testified during his deposition that he believed Schreiber deviated from the standard of care by assigning Jones an ESI 3 versus a 2. Dr. Gabaeff generally testified that "[Jones] fulfilled the SIRS criteria in triage one" and discussed Jones' other symptoms which he concluded were red flags of septic shock present upon Jones' arrival at the emergency department. At the deposition, defendants' attorney asked Dr. Gabaeff about his notes. The parties marked all Dr. Gabaeff's notes as a group exhibit.

¶ 72    We hold that Dr. Gabaeff's proposed testimony that the nurse defendants' conduct was a proximate cause of the death in this case "did not advance a new theory of negligence or new reasons for his opinion." *Foley*, 361 Ill. App. 3d at 48. Plaintiff's pretrial disclosures clearly disclosed Dr. Gabaeff's opinion that deviations from the standard of care by "the other defendants," *i.e.*, defendant nurses, "proximately caused the Decedent's death." Based on that

disclosure we find plaintiff disclosed "the 'general opinions' that [her] expert would testify to during trial." *Jones*, 2014 IL App (1st) 131124, ¶ 18, citing *Spaetzel*, 393 Ill. App. 3d at 813. In addition to disclosing Dr. Gabaeff's opinion that the nurse defendants' conduct was a proximate cause of the death, the pretrial disclosures adequately revealed the bases for Dr. Gabaeff's opinions as being specifically the failure to obtain a complete medical history and to properly triage the patient. The disclosure of the expert's "general opinions" was sufficient to put the defendants on notice regarding the details that emerged. See *id.* Dr. Gabaeff's proximate cause testimony was consistent with the disclosures contained in the plaintiff's Rule 213(f) answers to interrogatories and the disclosures in the exhibit to his deposition testimony. See *Aguilar-Santos*, 2017 IL App (1st) 153593, ¶ 57.

¶ 73    On appeal, defendants argue "Dr. Gabaeff's Rule 213 answers and report *** only speaks to the negligence of the nurses and states nothing about how the purported deviations by the nurses proximately caused Ms. Jones' death." However, any alleged deficiencies in this regard would go to the weight of the evidence, not its admissibility. See *Aguilar-Santos*, 2017 IL App (1st) 153593, ¶ 57 (holding that a party's pretrial disclosures were sufficient where pretrial disclosure of proximate cause opinion was not expressly stated but could be gleaned from the statement of general opinion as to proximate cause and written records provided in discovery); see also *Pack*, 2019 IL App (1st) 182447, ¶¶ 87-89. We also find defendants' argument unpersuasive where, based on the disclosed opinions, testimony "regarding compliance with the standard of care [and] *** proximate causation *** were all logical corollaries of the pretrial disclosures." See *Jones*, 2014 IL App (1st) 131124, ¶ 19.

¶ 74    Furthermore, defendants argue that Dr. Gabaeff's notes were not "discussed in detail in his deposition testimony." Even if we accept that argument as a proper characterization of the

deposition, a properly disclosed opinion is not invalidated simply because counsel fails to make detailed inquiry into the disclosed basis for that opinion at the deposition. See *Pack*, 2019 IL App (1st) 182447, ¶¶ 87-89.

¶ 75    We find *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837 (2010), on which defendants rely, distinguishable.  In that case, the defendant doctor used a metal plate to repair the broken femur of a patient.  The plate failed one month after treatment. The expert opined that the wrong medical device failed.  At issue was whether a broad plate or a narrow plate was used. *Wilbourn*, 398 Ill. App. 3d at 850-51.  The disputed subject of disclosure was the basis for the expert's opinion that the wrong device was used, not whether it was the wrong device or that it had failed. See *id.*  The plaintiff's pretrial disclosures in that case stated that the expert knew the wrong device (a narrow plate instead of a broad plate) was used based on the appearance in x-rays taken.  *Id.* at 851.  At trial, the expert stated that he had never seen a broad plate fail within a month after implantation.  We affirmed the trial court's order striking testimony that a broad plate would not have failed in a month.  We held the basis for the testimony that the expert knew the wrong device was used had to be elicited by the proponent of the expert or placed in 213 responses.  *Id.*  In *Wilbourn*, the defendants were "surprised" by his testimony that he knew which device was used, not only due to its appearance but also because a broad plate would not have failed within a month.  In this case, however, the pretrial disclosures put defendants on notice that Dr. Gabaeff would testify that specific conduct by nurse defendants was a proximate cause of the death.  We find defendants were not surprised by Dr. Gabaeff's testimony within the meaning of the Rule.  *Sullivan*, 209 Ill. 2d at 109-10.

¶ 76    For the foregoing reasons, we find the trial court abused its discretion in denying plaintiff's request to recall Dr. Gabaeff to testify concerning his opinion about whether nurse

defendants' previously disclosed deviations from the standard of care were a proximate cause of the death. We find that there was sufficient evidence in the record of the deviations from the standard of care on which Dr. Gabaeff relied to provide an adequate foundation for his testimony on that subject. *In re Saline Branch Drainage District*, 19 Ill. App. 3d 125, 132 (1974) ("The rule is clear that one test of admissibility of the opinion of an expert witness is whether there is sufficient evidence in the record to act as a foundation of the expert's opinion.").

¶ 77    In this case, DeBoer testified that Schreiber deviated from the standard of care by (1) not obtaining a complete medical and surgical history from Jones; and (2) based on that failure, did not assign Jones a level 2 ESI categorization at triage and instead assigned her a level 3 ESI. Harris testified that Jasper deviated from the standard of care when he failed to take an adequate history from Jones and provided an ineffective report to the attending physician. We find the opinions of these other two experts to be consistent with Dr. Gabaeff's opinion that the delay occasioned by the acts or omissions of the nurses proximately caused Jones' death.

¶ 78    Under *Sullivan*, 209 Ill. 2d at 112-24, Dr. Gabaeff is not entitled to offer an opinion to the jury about what standard of care applies to the nurses or whether specific acts or omissions by the nurses constituted negligence. However, Dr. Gabaeff offered an opinion before trial and was prepared to testify that the delay in Jones's treatment while in the nurses' care, before she reached Dr. Dissanayake, resulted in Jones not being offered appropriate and timely medical intervention to avoid death. Dr. Gabaeff was prepared to testify that the fact that Jones went untreated for several hours was the proximate cause of her death. Setting aside any specific criticisms as to what the nurses did or should have done, it is Dr. Gabaeff's opinion that the overall delay in treatment put Jones on the path to her demise—that by the time Dr. Dissanayake began treating Jones, much of the damage was already done. Dr. Gabaeff is clearly qualified to

offer an opinion that the delay in rendering the appropriate treatment to Jones caused her death. The factfinder can only make a fair assessment of liability in this case by hearing Dr. Gabaeff's testimony about proximate cause alongside the opinions of DeBoer and Harris who are the experts competent to testify about the applicable standard of care and whether the nurse defendants breached that standard.

¶ 79     The rule in *Sullivan* ensures that a testifying expert has expertise in dealing with the patient's medical problem and treatment and that the allegations of negligence are within the expert's knowledge and observation. *Wingo by Wingo v. Rockford Memorial Hospital*, 292 Ill. App. 3d 896, 906 (1997). When the allegations do not concern a specific nursing procedure but, rather, a general observation of the applicable field of medicine, then the allegations may be well within the testifying doctor's knowledge and experience. *Id.* "As a general rule, '[e]xpert testimony is admissible if the proffered expert is qualified by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence.' " *Johnson v. Johnson*, 386 Ill. App. 3d 522, 544-45 (2008).  Here, Dr. Gabaeff is qualified to testify that a delay in treating Jones before she reached a doctor proximately caused her death.

¶ 80     It is true that Dr. Gabaeff referred in his report to negligent acts or omissions by the nurses that contributed to the delay in treatment, and defendants are correct that such testimony would not be admissible under *Sullivan*. The court would have been well within its discretion to disallow *that* portion of any testimony Dr. Gabaeff offered. But it does not follow that *all* of Dr. Gabaeff's testimony on the delay in treatment should have been barred. He clearly had the qualifications to opine that one of the proximate causes of death was a significant delay in treatment before the patient reached Dr. Dissanayake, even if he could not opine as to who was,

or was not, to blame for that delay. And that opinion was disclosed repeatedly throughout his report; indeed, Dr. Gabaeff wrote that the delay in treatment was the most significant cause of Jones's death. By disallowing all of this testimony about delay in treatment, including testimony that was disclosed well in advance and on which Dr. Gabeff unquestionably had the qualification to opine, the trial court went too far. And in so doing, the trial court barred expert testimony that established proximate cause against the nurses for their alleged delay in getting adequate treatment for Jones, leaving plaintiff defenseless against a motion for directed verdict. The error, in other words, was anything but inconsequential; it made a defense verdict all but inevitable.

¶ 81    Dr. Gabaeff clearly disclosed that the delay in rendering medical intervention to Jones proximately caused her death. See, *e.g.*, *supra* ¶¶ 55, 70-71. We reject defendants' arguments and the trial court's ruling that Dr. Gabaeff's proposed testimony in this regard was a new opinion or was otherwise not disclosed prior to trial. Based on the totality of the pretrial disclosures, defendants would not in any way be surprised to have testimony about the delay in treatment constituting proximate cause admitted at trial.  See *Jones*, 2014 IL App (1st) 131124, ¶ 18, *Zickuhr v. Ericsson, Inc.*, 2011 IL App (1st) 103430, ¶¶ 84-85.

¶ 82    Having found that the trial court erred when it barred Dr. Gabaeff's testimony on proximate cause, we must determine if the error warrants reversal.  "[I]t is axiomatic that error in the exclusion or admission of evidence does not require reversal unless one party has been prejudiced or the result of the trial has been materially affected.  [Citation.]"  (Internal quotation marks omitted.)  *Spaetzel*, 393 Ill. App. 3d at 814.  In this case, the exclusion of Dr. Gabaeff's opinions as to proximate cause prejudiced plaintiff in her case against the nurse defendants. Without the pertinent testimony from Dr. Gabaeff, plaintiff was unable to submit evidence in support of an essential element of her claim. The trial court granted a directed verdict in the

nurse defendants' favor on the basis that plaintiff failed to produce evidence on the issue of proximate cause. Dr. Gabaeff's testimony would have been sufficient to make a *prima facie* showing of proximate cause sufficient to defeat a motion for a directed verdict. Because Dr. Gabaeff's proposed testimony on proximate cause relating to the nurses' actions should have been allowed, no directed verdict in favor of the nurse defendants should have been entered. Accordingly, plaintiff is entitled to a new trial on her claims against the nurse defendants.

¶ 83     Plaintiff contends that if we find she is entitled to a new trial on her claims against the nurse defendants, we should likewise find that she is entitled to a new trial on her claims against Dr. Dissanayake. Plaintiff's claims against Dr. Dissanayake were submitted to the jury, and the jury returned a finding of no liability. Plaintiff argues that "[o]nce the trial court directed a verdict in favor of the nurses, it was all but decided that the doctor could not have been negligent." We reject plaintiff's assertions regarding the verdict in favor of Dr. Dissanayake.

¶ 84     Plaintiff did not raise the issue that the directed finding resulted in an unfair assessment of her claims against Dr. Dissanayake in her posttrial motion. Following a jury trial, a party claiming an error in the proceedings must raise the claim in a posttrial motion in order to preserve it for review. Ill. S. Ct. R. 366(b)(2)(iii) (eff. Feb. 1, 1994) (West 2018); *Ellig v. Delnor Community Hospital*, 237 Ill. App. 3d 396, 403 (1992). Here, plaintiff raised the issue for the first time in a reply brief.

¶ 85     Moreover, plaintiff was permitted to introduce all the evidence she sought to introduce at trial as it pertained to Dr. Dissanayake's potential liability. The jury was provided with all the evidence plaintiff submitted regarding her claims against Dr. Dissanayake, and the jury deliberated and returned a verdict of no liability in the doctor's favor. Plaintiff does not argue that the verdict in favor of Dr. Dissanayake was against the manifest weight of the evidence.

Plaintiff's speculation about what potential impact the directed verdict had on the jury's deliberations is insufficient to carry her burden to entitle her to a new trial on the claims against Dr. Dissanayake. With plaintiff having failed to demonstrate any prejudice, we hold that the judgment of no liability entered in favor of Dr. Dissanayake stands.

¶ 86                                         CONCLUSION

¶ 87     For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part and reversed in part. The judgment of no liability in favor of defendant Dr. Dissanayake is affirmed. The directed verdict entered in favor of defendants Mark Jasper and Elisabeth Schreiber is reversed and the case is remanded for a new trial as to the claims against those defendants only.

¶ 88     Affirmed in part, reversed in part, remanded for further proceedings.